**PEPPERELL ASSOCIATES,**
**Petitioner,**

**v.**

**UNITED STATES ENVIRONMENTAL PROTECTION AGENCY,**
**Respondent.**

**No. 00–1708.**

United States Court of Appeals,
First Circuit.

Heard Feb. 6, 2001.

Decided April 11, 2001.

---

Martha C. Gaythwaite and Friedman Babcock & Gaythwaite on brief for petitioner.

Lois J. Schiffer, Assistant Attorney General, and D. Judith Keith, Trial Attorney, Environmental & Natural Resources Division, of the Environmental Defense Section, U.S. Department of Justice, and Andrew Gordon, David Drelich, and Tonia Bandrowicz, of the Environmental Protection Agency, on brief for respondent.

Before SELYA, LYNCH and LIPEZ, Circuit Judges.

LYNCH, Circuit Judge.

This case illustrates the perils facing a small business that does not determine whether it is subject to regulation under 33 U.S.C. § 1321, the oil spill provision of the Clean Water Act. Pepperell Associates operates a business out of an old textile mill building in Lewiston, Maine. In October 1996, a rupture in a gasket on a boiler caused an oil spill in the boiler room of the building. Some three- to four-hundred gallons of the oil ultimately worked its way into Gully Brook and from there to the Androscoggin River, both navigable waters of the United States. The spill was largely contained with the help of cleanup experts sent in by the state of Maine.

The Environmental Protection Agency responded with a three count administrative penalty action against Pepperell. That complaint was heard by an administrative law judge and the results were appealed by both sides to the Environmental Appeals Board ("EAB"). Pepperell ended up with an order that it had violated its obligation to have a spill control plan, that it was not excused from having such a plan during a limited period by the installation of a new oil storage tank, and that it must pay a total penalty of $43,643 for the three counts of the complaint. Pepperell has sought judicial review of that order in this court. *See* 33 U.S.C. § 1321(b)(6)(G)(ii). We deny the petition for review.

## I.

The facts are undisputed. The case instead concerns what conclusions may rationally be drawn from those facts. Pepperell Associates is the owner and operator of the historic Pepperell textile mill, located in an industrialized section of downtown Lewiston. In June 1985, after its use as a mill had been discontinued, Pepperell purchased the facility and used the building as light industrial and warehouse rental space. At the time of the spill, the mill complex had three underground heating oil storage tanks, each with a capacity of 30,000 gallons. The tanks were located next to the facility's boiler room, and only two were still connected to the boiler. About 500 feet from the facility is Gully Brook, a tributary of the Androscoggin River. Both are navigable waters of the United States.

A spill occurred early in the morning on October 17, 1996, when a gasket ruptured on the facility's boiler, spilling oil onto the boiler room floor. That oil then flowed down a stairwell, through a condensate pipe tunnel, and into the city sewer conduit and box culvert.[1] Ordinarily the city sewer conduit and box culvert discharge municipal solid waste and storm water from Lewiston to the Lewiston–Auburn Treatment Plant. However, during times of high water, the box culvert also operates as a combined sewage and storm water overflow ("CSO"), which periodically discharges into Gully Brook. In this case, the oil not only spilled into the sewer line but also discharged through the culvert into Gully Brook.

As a result of the spill, some of the oil entered the Androscoggin River from its tributary. The spill caused a noticeable sheen on the surface of both Gully Brook and the Androscoggin River, with the sheen on the Androscoggin extending for approximately one mile from their confluence. The remainder of the oil entered the city treatment facility, which lacks the capacity to treat such industrial wastes.

On the morning of the spill, one of the owners of Pepperell contacted the Maine Department of Environmental Protection ("MDEP"). The MDEP and the EPA, along with the Coast Guard and the fire department, assisted Pepperell in responding to the spill. The MDEP arranged for cleanup of the spill, spending a total of $23,643.82 for cleanup of the boiler room, Gully Brook, the Androscoggin River, and the treatment plant. In all, between 350 and 400 gallons of oil reached Gully Brook and the Androscoggin River, of which 300 gallons were recovered. As provided by

Maine law, Pepperell partially reimbursed the state for the costs of cleanup.

On the day of the spill, the EPA's On–Scene Coordinator Scott Pellerin informed the owners of Pepperell that upon his inspection he believed that Pepperell was required by the Clean Water Act to have already prepared and implemented a Spill Prevention Control and Countermeasures ("SPCC") Plan for the facility. On October 31, 1996, Pepperell disconnected a second of the underground tanks from the boiler and took it out of use. And on July 14, 1997, Pepperell removed all three tanks from the ground. Up to the time of the removal of the tanks, Pepperell had not prepared or implemented an SPCC plan. On October 16, 1997, Pepperell replaced the tanks with a single 20,000–gallon above-ground storage tank. On April 14, 1998, Pepperell submitted an SPCC plan that recommended a series of alterations to the facility designed to prevent oil spills, and that plan was fully implemented on or about September 15, 1998.

## II.

Following the oil spill, the EPA filed an administrative complaint against Pepperell alleging that it had failed to prepare and implement a Spill Prevention Control and Countermeasures Plan as required by the Clean Water Act, *see* 33 U.S.C. § 1321(j)(1); 40 C.F.R. Part 112, and that it had discharged oil into a navigable waterway in violation of that Act, *see* 33 U.S.C. § 1321(b)(3).

On September 29, 1998, the complaint was amended to include three counts. The EPA charged in Count One of the complaint that Pepperell had operated a facility regulated under the Oil Pollution Pre-

---

1. There was also a floor drain on the boiler room floor that connected directly to the sewer conduit, as is common in buildings of the age of the mill, although the oil did not actually take this path.

vention regulations throughout the period when the three tanks had been in the ground—from December 1985 to July 14, 1997—and had failed to prepare and implement an SPCC plan. Count Two charged that from the completion of the above-ground tank in October 16, 1997, until the submission of an SPCC plan on April 14, 1998, Pepperell had operated a facility regulated under the Act, and had both failed to prepare an amended SPCC plan as required and failed to implement such a plan within six months of the completion of the modification. Count Three alleged that on October 17, 1996, Pepperell discharged oil in harmful quantities into a navigable water of the United States in violation of 33 U.S.C. § 1321(b)(3). For these three violations, the EPA sought a total penalty of $47,930.

Following a hearing in October 1998, the administrative law judge issued an initial decision on February 26, 1999. The judge found Pepperell liable under Count One for failure to have implemented an SPCC plan with regard to the underground tanks, but determined that Pepperell's liability extended only from December 1985 to October 31, 1996, when Pepperell disconnected the second storage tank from the boiler, reasoning that the disconnection of the second tank reduced Pepperell's underground storage capacity below the 42,000–gallon capacity threshold for jurisdiction under the SPCC regulations, see 40 C.F.R. § 112.1(d)(2). Having found that Pepperell was not required to have an SPCC plan from November 1, 1996, to the removal of the underground tanks in July 1997, the administrative law judge assessed Count Two under the provision governing new plans for facilities that are beginning operation rather than the provision governing plan amendments when modifications are made to facilities already in operation. Applying this provision, the judge dismissed Count Two. The adminis-

trative law judge found Pepperell liable under Count Three for the oil spill, but reduced the penalty to reflect Pepperell's partial repayment of the cleanup costs to the state of Maine, assessing a total penalty of $24,876.

Both sides appealed to the Environmental Appeals Board. On appeal, the EPA contended (1) that Pepperell's liability under Count One should extend to July 14, 1997; (2) that the administrative law judge erred as to Count Two by applying the standard and deadlines for new rather than amended SPCC plans; and (3) that a proper evaluation of the statutory penalty factors warranted a higher penalty for the alleged violations. Pepperell also appealed, contesting its liability under Count One on the ground that given its location, the discharge of oil into navigable waters could not reasonably be expected. Pepperell also contested the penalty calculation.

The EAB issued its decision on May 10, 2000. The EAB held that the administrative law judge was correct on Count One that the facility was subject to SPCC regulations because due to its location, it could reasonably be expected to discharge oil in harmful quantities into navigable waters, and, contrary to the administrative law judge, that this liability extended until July 1997, because throughout that time the facility met the storage-capacity and foreseeability-of-discharge requirements. On the second count, the EAB reversed the administrative law judge, determining that the construction of the above-ground tank was a material modification of an existing facility subject to SPCC regulations and therefore subject to different deadlines than were it a wholly-new facility. The three-month period (from July to October 1997) when there was no oil capacity, the EAB said, was part of an ongoing process of modification, not a lapse in jurisdiction. Finally, the EAB reassessed the

penalty, and imposed a total penalty of $43,643. Pepperell now seeks judicial review.

### III.

■ Agency decisions, including those of the EPA under the Clean Water Act, are normally entitled to substantial deference provided the agency has followed its own procedures and its decisions meet the substantive statutory commands. A reviewing court shall not set aside or remand the EAB's finding of a violation under the Clean Water Act "unless there is not substantial evidence in the record, taken as a whole, to support the finding of a violation." 33 U.S.C. § 1321(b)(6)(G)(ii).

■ To the extent that the EAB's decision reflects a gloss on its interpretation of the governing EPA regulations, a reviewing court must also afford those policy judgments substantial deference, deferring to them unless they are arbitrary, capricious, or otherwise "plainly" impermissible. *See General Electric Co. v. United States Environmental Protection Agency,* 53 F.3d 1324, 1327 (D.C.Cir.1995); *see also Adams v. United States Environmental Protection Agency,* 38 F.3d 43, 49 (1st Cir.1994). That deference is particularly strong where the agency's expertise comes into play. *See General Electric,* 53 F.3d at 1327 ("The policy favoring deference is particularly important where, as here, a technically complex scheme is backed by an even more complex and comprehensive set of regulations."). *See also Puerto Rico Sun Oil Co. v. United States Environmental Protection Agency,* 8 F.3d 73, 77 (1st Cir.1993) ("But in the end an agency decision must also be rational—technically speaking, it must not be 'arbitrary or capricious,' Administrative Procedure Act, 5 U.S.C. § 706(2)(A)—and that requirement exists even in technical areas of regulation.").

The Clean Water Act provides that it is the policy of this country "that there should be no discharges of oil or hazardous substances into or upon the navigable waters of the United States [or their] adjoining shorelines ..." 33 U.S.C. § 1321(b)(1). The Act authorizes the promulgation of regulations to define which discharges are harmful and are therefore regulated. 33 U.S.C. § 1321(b)(4). Those EPA regulations provide that discharges of oil are harmful if, inter alia, the discharge causes "a film or sheen upon or discoloration of the surface of the water or adjoining shorelines." 40 C.F.R. § 110.3. Because the oil spill here caused a sheen, the EAB determined that that criterion was met.

Pepperell does not challenge the EAB's finding that it discharged a harmful quantity of oil into navigable waters (Count Three of the Complaint), but raises four other issues regarding the EAB's conclusions. First, Pepperell challenges the EAB's determination that it was subject to SPCC regulation, arguing that because of the location of the facility, it could not be reasonably expected to discharge oil into or upon navigable waters. In any case, Pepperell says, the EAB erred in finding it subject to SPCC regulation between November 1, 1996, and July 14, 1997, as its underground oil storage capacity was less than the jurisdictional threshold for SPCC regulation. Pepperell also argues that the EAB erred in finding the construction of the new 20,000–gallon above-ground storage tank was a modification of an existing facility rather than a new facility, and therefore holding it liable for not properly preparing and implementing an amended SPCC plan. Finally, Pepperell challenges the EAB's calculation of the penalty. We take these arguments in turn, and affirm the EAB's conclusion on each.

### A. *The Failure to Have an SPCC Plan*

■ Pepperell contests the initial finding that it was subject to the Spill Preven-

tion Control and Countermeasure regulations for the original three underground storage tanks. At issue here is the scope of coverage of the SPCC regulations. Those regulations apply to:

> [O]wners or operators of non-transportation-related onshore and offshore facilities engaged in ... storing ... oil and oil products, and which, due to their location, could reasonably be expected to discharge oil in harmful quantities ... into or upon the navigable waters of the United States or adjoining shorelines.

40 C.F.R. § 112.1(b). In turn, the regulations exclude:

> Onshore and offshore facilities which, due to their location, could not reasonably be expected to discharge oil into or upon the navigable waters ... This determination shall be based solely upon a consideration of the geographical, locational aspects of the facility (such as proximity to navigable waters or adjoining shorelines, land contour, draining, etc.) ...

40 C.F.R. § 112.1(d)(1)(i). An owner or operator subject to the regulations must prepare an SPCC plan in accord with certain requirements.

The dispute is over whether Pepperell is an included or excluded facility; that is, applying the test under the regulations, whether "due to [its] location," the discharge of a harmful quantity of oil into navigable waters from the facility was "reasonably foreseeable." Pepperell advances three lines of argument that such a discharge of oil was not reasonably foreseeable: (1) that considering the location of the facility in relation to Gully Brook alone, the discharge of oil into a navigable water could not be reasonably expected; (2) that the actual path taken by the oil could not be reasonably foreseen; and (3) that the unfortunate coincidence of the spill with high waters—a necessary condi-

tion for the oil reaching Gully Brook through the overflow—also could not have been reasonably foreseen.

As to the locational test, Pepperell says that, under the regulations, one considers only the "geographical" and "locational" aspects of the facility in assessing whether such a discharge is foreseeable." Pepperell claims that based on its location alone, there was no reason to expect a discharge from the facility into navigable waters. The mill facility is located in a dense industrial and urban area of downtown Lewiston, it says, out of sight of any navigable waters. Moreover, Pepperell points out, the building is more than a hundred yards from the Gully Brook, the nearest navigable waters, and there is no downward slope from the facility to the waters. Indeed, it says, a major road separates the mill facility from Gully Brook.

■ However, these facts, taken alone, do not compel the EAB to agree with Pepperell that, under the regulations, the discharge into navigable waters was not reasonably foreseeable upon consideration of the "locational aspects" of the site. Pepperell oversimplifies the "locational" test; the inquiry is not limited to stark description of surrounding terrain. The test's requirements are met so long as the EAB concludes that in light of the particular features of the site, a discharge into navigable waters was reasonably foreseeable. As the EAB notes, man-made features of a location that influence drainage patterns are highly relevant to any inquiry into the foreseeability of a harmful discharge. Upon consideration of the evidence about the site here, the EAB concluded that such a discharge was foreseeable. Of more concern are Pepperell's next two arguments, which challenge the support for this conclusion by the EAB.

Pepperell's next argument challenges the application of the SPCC regulations because the path actually taken by the oil to navigable waters was not, it says, foreseeable. Pepperell correctly argues that the EAB had doubts that one could reasonably predict the actual path taken by the oil spilled in October 1996 as it worked its way to ˙Gully Brook. The actual path taken by the oil is unclear, but it appears that the oil reached a condensate pipe tunnel at the mill, and from there somehow made its way into a sewer pipe, from which it overflowed into the Gully Brook. Because the path the oil took was not foreseeable, Pepperell says, it should not face liability under the SPCC regulations; the EAB, it says, was wrong to rely on a different theory involving an alternate pathway that oil might take, but which this oil spill apparently did not take.

The EAB agreed with Pepperell that a discharge into Gully Brook by the particular route taken in this case might not have been within Pepperell's reasonable anticipation. Nevertheless, the EAB determined that a discharge from the facility in general to navigable waters was reasonably foreseeable, and therefore Pepperell was liable for its failure to prepare and implement an SPCC plan. The EAB found that there was a floor drain in the boiler room, and that the drain directly connected with the sewer conduit, as is common. Thus, the EAB concluded, since it was reasonably predictable that oil which found its way into the floor drain would work its way to navigable waters, it was reasonably foreseeable that an oil spill in the boiler room of the facility might lead to such a discharge.

■ We cannot say that the EAB addressed itself to the wrong question or that its conclusion is not supported by substantial evidence. The regulations impose a duty to have an SPCC plan whether there is an oil spill or not. The point of the SPCC is to be prophylactic—to prevent oil discharges to navigable waters. The fortuity that the oil spill here did not follow the predicted route does not mean there was no obligation to have a plan. Rather, the EAB's conclusion that the facility in general exhibited locational and geographical characteristics that made a discharge to a navigable water foreseeable brings the facility within the jurisdiction of the SPCC regulations, and therefore the EAB was correct to impose liability on Pepperell for its failure to prepare and implement an SPCC plan.

Pepperell's third argument is that even if a discharge into the sewer conduit were reasonably foreseeable, as a general matter there was no reason to expect such a discharge to reach navigable waters. Only an accident of timing and of weather resulted in the discharge to navigable waters that occurred in this spill, it says, and such a coincidence was not reasonably foreseeable. Pepperell is correct that the city sewage system only overflows into Gully Brook during times of high water, such as heavy rain or storms, and otherwise carries its contents to Lewiston's sewage treatment facility. Indeed, Lewiston was in the midst of upgrading its sewer system, and was permitted by the EPA to discharge sewage to Gully Brook in the interim. It was Pepperell's ill fortune that its oil spill happened during one of these periods of high water.

The EAB did not overlook this concern and presume foreseeability once it found that there was a foreseeable pathway for the oil to reach the sewage system. Rather, the EAB also concluded that such overflow events occurred on a regular basis, and that a reasonably alert oil facility owner in Lewiston should have been aware that these overflows from the city sewage system into navigable waters occurred reg-

ularly. Overflows occurred whenever there were heavy rains or storms. In addition, the evidence showed that, regardless of weather, sewage overflows also occurred regularly in the morning hours, when the sewer flow typically runs high. Moreover, in this case, the owners of the oil storage facility not only should have known of the potential for overflow, but were in fact aware of it. Ralph Sawyer, one of Pepperell's owners, testified that he had seen overflow conditions from the sewage system into Gully Brook "generally early in the morning hours," and therefore he was aware of the routineness of such events. The mill owners' awareness of the potential overflow is further corroborated by the fact that on the morning of the spill they checked the overflow to see if the oil had reached Gully Brook.

While the EAB could rationally have found that Lewiston's failure to have completed an upgraded sewer system should render the risk that sewage would overflow into navigable waters unforeseeable to those hooked up to its sewer lines, nothing compelled the EPA to reach such a result. There is sufficient evidence that a reasonably alert owner would be aware of the possibility of an overflow, and it is reasonable under those circumstances to view the objective of preventing oil spills as best served by requiring such foresight on the part of the owners and operators of oil storage facilities.

*B. Liability from October 31, 1996, to July 14, 1997*

■ Under the SPCC regulations, owners and operators of oil storage facilities have another safe harbor from the SPCC requirements. Under the EPA regulations, facilities which would "otherwise" be subject to the SPCC jurisdiction are excepted from SPCC regulation where the oil storage capacity of those facilities is under a specified level. Thus, even though Pepperell is otherwise subject to the SPCC requirements, it can avoid those requirements if it can show that its storage capacity fell below the minimum amount required for application of the SPCC regulations. Those regulations provide that their requirements do not apply to facilities where

(i) [t]he underground buried storage capacity of the facility is 42,000 gallons or less of oil, and

(ii) [t]he storage capacity, which is not buried, of the facility is 1,320 gallons or less of oil, provided no single container has a capacity in excess of 660 gallons.

40 C.F.R. § 112.1(d)(2).

As Pepperell points out, the regulations do not provide any further definition of storage capacity. Pepperell makes two arguments. Pepperell argues that by disconnecting the second underground tank from the boiler in late October 1996, it reduced its oil storage capacity to 30,000 gallons, below the 42,000–gallon threshold, and therefore the regulations should be deemed not to apply from that point forward. This is particularly so, it says, since by disconnecting the tank it eliminated any reasonably foreseeable path for any oil to flow to navigable waters, since the only foreseeable path identified by the EPA was through the boiler room. This argument makes a difference to the amount of civil penalty which can be assessed on Pepperell for not having such an SPCC plan because the penalty amount is tied to the number of days of noncompliance. Second, Pepperell says that if these actions were not sufficient to reduce storage capacity under the regulations, then it was given inadequate notice of what it was expected to do to remove the tank from service.

■ The EPA took the position, adopted by the EAB, that simply discon-

necting a tank does not reduce the storage capacity amount unless and until the tank is properly taken out of service. At a minimum, the EPA says, taking a tank out of service properly means emptying the tank and cleaning it, making alterations to be sure the tank cannot be refilled, and installing a cap or blank flange on the intake pipe to ensure the tank is not usable. The evidence adequately supports the EAB's determination that the tanks were not taken out of service properly within that definition.

Pepperell's more serious argument attempts to link the assessment of storage capacity under this exception in the regulations to the reasonable foreseeability of a threat that oil might discharge into navigable waters. Pepperell contends that since the only foreseeable path for oil to reach the navigable waters was through the sewer by way of the boiler room, disconnecting the tank from the boiler should suffice to reduce the relevant storage capacity, since it proportionately reduces the risk of harmful discharge. Simply put, if the oil could not get to the boiler room from the second tank, the storage capacity of that tank did not fall within SPCC jurisdiction, because a discharge to navigable waters from the tank was no longer reasonably foreseeable.

▇ The administrative law judge basically adopted this position, but the EAB rejected it. Instead, the EAB interpreted the determination of reasonable foreseeability and the assessment of storage capacity to be two distinct, sequential inquiries, the latter exception being considered only once the requirements of the former were met. Looking to the structure of the regulations, the EAB reasoned that the regulations pose a two-tiered test, not an interrelated one. As the EAB put it,

> While related, these two elements are neither interdependent not intertwined. Importantly, the only quantitative dimension to the first element is the requirement that a discharge of a *harmful quantity* be expected. The second element adds the idea that even if a harmful discharge can be expected, a facility may still escape regulation if its storage *capacity* is sufficiently small.
>
> . . . .
>
> The choice of terms and the structure of the regulations reflect the Agency's judgment that facilities that have a large storage capacity and a potential for harmful discharge must have SPCC plans, whether or not all the available capacity is in use and irrespective of the discharge potential of individual storage units within the facility.

*In re Pepperell Assocs.*, Final Dec. at 22, 2000 WL 576426 (EPA EAB May 10, 2000) (emphasis in original).

While Pepperell's reading of the regulations is reasonable, the terms of the regulations do not compel that reading. We cannot say that the EAB's interpretation of the regulatory scheme is contrary to the language of the regulations, nor that it is arbitrary. As an initial matter, the EAB's reading provides for ease in administration. Indeed, a panoply of problems might arise if storage capacity could be manipulated with such ease as Pepperell suggests. It is not unreasonable for the agency to assess storage capacity in terms of the total potential storage capacity of the existing physical plant absent a significant structural modification, thereby ensuring a stable assessment of storage capacity for a given facility.[2] In addition, the EAB's

---

2. The EAB has addressed the end of ensuring a stable assessment of storage capacity in a different but also important context: capacity, the EAB determined, comes on line when the storage tank is first installed, not when it is connected to piping or actually filled. *See In*

construction of the regulations may also reflect the view that the presence of underground storage tanks in proximity to a foreseeable route to navigable waters is itself a potential threat, or at least sufficiently so not to apply an exception to the general rule that an SPCC plan is required unless the tanks are truly taken out of service. We must defer here to the agency's expertise, and to its construction of its own regulations.

▉▉▉▉ As to Pepperell's argument that it lacked notice, it was not raised in a timely fashion before the agency, and so is not before us for review. *E.g. United States v. L.A. Tucker Truck Lines, Inc.*, 344 U.S. 33, 37, 73 S.Ct. 67, 97 L.Ed. 54 (1952) (discussing the general rule "that courts should not topple over administrative decisions unless the administrative body ... has erred against objection made at the time appropriate under its practice"); *Khalaf v. INS*, 909 F.2d 589, 592 (1st Cir.1990) (explaining that issues not raised before an administrative appeals board cannot be adjudicated in the course of judicial review). As we have noted, "this rule preserves 'judicial economy, agency autonomy, and accuracy of result' by requiring full development of issues in the administrative setting to obtain judicial review." *Northern Wind, Inc. v. Daley*, 200 F.3d 13, 18 (1st Cir.1999) (citations omitted).

## C. The Above–Ground Tank and the Failure to Amend the SPCC Plan

Next, Pepperell contends that the EAB erred in applying the standards and deadlines for filing an amended SPCC plan upon the modification of an existing facility in regard to Pepperell's construction of the above-ground tank in October 1997, rather than the standards and deadlines applicable to a new storage facility. Under the regulations there is less time provided to prepare and implement SPCC plans for modifications to pre-existing facilities than for new facilities. *Compare* 40 C.F.R. § 112.3(b) (plan must be submitted within six months and fully implemented within a year of when new facility begins operation), *with* 40 C.F.R. § 112.5(a) (plan must be amended whenever existing facilities modified and such amendments must be fully implemented within six months of the modification). The EAB held Pepperell liable under 40 C.F.R. § 112.5 for failing to prepare an "amended" SPCC Plan contemporaneously with the installation in October 1997 of the above-ground storage tank, and for not implementing the plan within six months of that installation. The facts adequately support the EAB's factual determinations as to the timing of the events. At issue is whether the regulations for modifications to existing facilities were the appropriate standards to apply.

▉▉▉ Pepperell argues that the above-ground tank is properly considered a new facility. Pepperell says that it removed all three of its underground storage tanks in July 1997, and had no storage capacity whatsoever until it installed this new above-ground storage tank on October 16, 1997. At a minimum, Pepperell contends, this gap in time means that its above-ground tank was a new facility, and so the EAB ought to have assessed Pepperell's compliance with the SPCC regulations under the deadlines for new facilities. Pepperell says it met those deadlines, which allow it six months from the installation of the tank to file a new plan, and one year from its installation to implement that plan. It is unfair, Pepperell says, to impose a penalty on it for not filing an amendment to an SPCC plan when it believed that it was under no obligation to

*re Ashland Oil, Inc.,* 4 E.A.D. 235, 249, 1992 WL 235125 (EPA 1992).

file the original SPCC plan in the first instance, much less an amended one. Pepperell argues that, whether or not it was obliged to file an SPCC plan before the three underground tanks were removed, its only obligation with regard to the above-ground tank was to file a timely plan once its facility became operational, *see* 40 C.F.R. § 112.3, and that was when it installed the new tank.

To the extent Pepperell's argument rests on the premise that no plan was required before the final removal of all three underground tanks, we have rejected that premise. Our sole concern on this issue is with the period of time between the removal of the three underground tanks in July and the installation of the above-ground tank in October.

The EAB viewed Pepperell's argument as an attempt to make an end run around the regulations governing modifications to existing facilities. In the EAB's view, a three month gap in time between pulling out old tanks and installing new ones, particularly where the length of that gap was controlled by the owners or operators of an existing facility, could not suffice to convert an existing facility to a new one. On appeal, Pepperell responds that leaving it to the EAB's discretion to determine what period is a sufficient gap is entirely arbitrary.

Pepperell's argument is not persuasive. Perhaps in a different case, with a gap of a much longer period of time between the removal of storage capacity from service and the installation of new storage capacity, it would be arbitrary to consider the newly installed capacity a modification of an existing facility, but we cannot say that about the determination here. The purpose of providing a more generous time line for new facilities is to recognize that new facilities may face challenges not faced by existing operations. Pepperell

was hardly in that position. Further, the two acts—pulling out old tanks and installing a new one—are not unconnected. This is New England. The removal of a fuel source for heating inevitably means its replacement with another source. It would be odd if such a replacement scheme over the course of a single summer could turn an existing facility into a new one. We do not think the EAB's conclusion that the gap here was part of the ongoing process of modification is either arbitrary or unreasonable.

Pepperell makes one more stab. Even if the EAB is generally correct that this was not a new facility but a modification, it says, the change does not "materially affect[ ] the facility's potential for discharge of oil into or upon the navigable waters of the United States," *see* 40 C.F.R. § 122.5(a), and therefore the obligation to file an amended SPCC plan is not triggered. This argument is frivolous. First, the record shows that, as the EPA regional enforcement coordinator testified, above-ground tanks "have a much greater capacity for a catastrophic spill because if the tank ruptures, there's no surrounding soil to contain the oil, as in the underground storage tank scenario." The safe harbor regulations also illustrate the added risk created by above-ground tanks, exempting underground tanks from the SPCC requirements for up to 42,000 gallons of storage capacity, while only exempting above-ground tanks up to 1320 gallons of capacity. Here the above-ground tank was 20,000 gallons. In any case, 40 C.F.R. § 112.5 presumes that an existing facility already has an SPCC plan in place when it limits the amendment requirement to material changes; here Pepperell had no such plan until more than six months after the modification. The EAB's conclusion that this was not a new facility, and therefore that Pepperell was

liable for failing to implement an amended SPCC plan in a timely fashion, was hardly arbitrary.

### D. The Calculation of Penalties

Finally, in addition to challenging its liability under the SPCC regulations on the first two counts, Pepperell contests the amount of the penalties assessed by the EAB on each of the three counts. Because we have affirmed Pepperell's liability on the first two counts, we consider only those arguments that do not depend on Pepperell's assertion that it was not liable.

The Clean Water Act sets out the factors to be considered in setting the amount of a civil penalty for its violation. In determining the amount of a penalty under the Act, the body administering the statute and imposing the penalty shall:

> consider the seriousness of the violation or violations, the economic benefit to the violator, if any, resulting from the violation, the degree of culpability involved, any other penalty for the same incident, any history of prior violations, the nature, extent, and degree of success of any efforts of the violator to minimize or mitigate the effects of the discharge, the economic impact of the penalty on the violator, and any other matters as justice may require.

33 U.S.C. § 1321(b)(8).

Judicial review of penalties imposed under the Clean Water Act are reviewed for "abuse of discretion." 33 U.S.C. § 1321(b)(6)(G)(ii). The scope of that review is very limited. *E.g., All Regions Chemical Labs, Inc. v. United States Environmental Protection Agency*, 932 F.2d 73, 75 (1st Cir.1991); *Newell Recycling Co. v. United States Environmental Protection Agency*, 231 F.3d 204, 208 (5th Cir.2000). Courts must give deference to the EPA's "highly discretionary calculations that take into account multiple factors" to set penalties under the Clean Water Act. *Tull v. United States*, 481 U.S. 412, 427, 107 S.Ct. 1831, 95 L.Ed.2d 365 (1987). Because of that deference, our discussion of the penalty amounts is brief.

On Count One, the EAB imposed a penalty of $22,133, adding $6,748 to the administrative law judge's assessment. Pepperell argued to the EAB that its penalty should be reduced because the company lacked environmental expertise and cooperated in the cleanup efforts once the spill happened. The EAB rejected this argument. First, the EAB pointed out that the company was aware that its oil storage tanks were regulated by the Maine Department of Environmental Protection, and therefore found the company was on notice that its tanks could cause environmental contamination. On this basis, the EAB concluded, Pepperell should have inquired about whether it was also subject to EPA regulation. As to its efforts to cooperate, the EAB adopted the view of the administrative law judge that Pepperell's efforts were too little, too late. These are reasoned views as to which we defer.

On the second count, the EAB assessed a penalty of $8,855 for failing to prepare and implement in a timely manner an amended SPCC plan. Pepperell argues that the EAB did not consider mitigating factors, such as its ignorance of the applicable regulations and its efforts to comply once it became aware of them. The opinion of the EAB belies Pepperell's claim that these factors were not considered. Indeed, the EAB found that "[t]his is a case not about regulatory confusion, but about indifference." *In re Pepperell*, Final Dec. at 42. Again, we give deference.

Finally, as to the third count, the EAB assessed a penalty of $12,655 for the harmful discharge of oil into or upon a navigable water. Pepperell contends that

the statute requires consideration of "other matters as justice may require," that its partial reimbursement to the state of Maine for the cleanup is such a factor, and that it justifies reducing the penalty. The administrative law judge agreed with Pepperell on this point, and the EAB reversed. The EAB's decision addressed this issue at length, and its discussion shows that it adequately considered Pepperell's arguments and had a reasoned basis for its decision. *See In re Pepperell*, Final Dec. at 44–46. Again, we defer.

We do not suggest that a reasonable person could not have viewed the penalty issue as Pepperell did. But its arguments are better made to the agency than to a reviewing court, and here the agency rejected the arguments for adequate reasons.

Accordingly, we *deny* Pepperell's petition for review of the decision of the EAB on all points. So ordered.