# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

No. 12-30883

United States Court of Appeals
Fifth Circuit

**FILED**

June 4, 2014

Lyle W. Cayce
Clerk

IN RE: DEEPWATER HORIZON

_____

UNITED STATES OF AMERICA,

Plaintiff – Appellee

v.

B.P. EXPLORATION & PRODUCTION, INCORPORATED; ANADARKO
PETROLEUM CORPORATION,

Defendants – Appellants

Appeals from the United States District Court
for the Eastern District of Louisiana

Before KING, BENAVIDES, and DENNIS, Circuit Judges.

FORTUNATO P. BENAVIDES, Circuit Judge:

Before the Court is the federal government's civil enforcement action for Clean Water Act violations associated with the 2010 *Deepwater Horizon* oil spill in the Gulf of Mexico. Defendants BP Exploration & Production, Inc. ("BP") and Anadarko Petroleum Corporation ("Anadarko") appeal summary judgment in favor of the government on the question of their liability for civil penalties under 33 U.S.C. § 1321(b)(7)(A) (2006), which imposes mandatory penalties upon the owners of facilities "from which oil or a hazardous substance is discharged." The district court held that discharge is the point where "uncontrolled movement" begins. *In re Oil Spill by the Oil Rig "Deepwater*

No. 12-30883

*Horizon" in the Gulf of Mexico, on April 20, 2010*, 844 F. Supp. 2d 746, 758 (E.D. La. 2012). Applying this standard, the court concluded that oil flowing from the well through the *Deepwater Horizon*'s riser was a discharge from the well. *Id.* at 761. The court then entered summary judgment on the issue of BP's and Anadarko's liability as co-owners of that well. *Id.* at 762. Because we agree that there is no dispute of material fact regarding the discharge of oil from the well, we affirm.

I.

The Macondo Well ("the well") was an exploratory well located about fifty miles off the Louisiana coast in the Gulf of Mexico. Anadarko and BP (together, "the defendants" or "the well owners") were co-owners of the well and co-lessees of the continental shelf block in which the well was located.[1] The well itself was drilled by the *Deepwater Horizon*, a mobile offshore drilling vessel owned and operated by several Transocean entities.[2] The *Deepwater Horizon* was connected to the well by a riser. At the junction of the well and the riser was a blowout preventer that could be used automatically or manually to interrupt an impending blowout. Both the blowout preventer and riser were appurtenances of the *Deepwater Horizon*.

The blowout occurred on April 20, 2010, while the *Deepwater Horizon* was preparing to depart from the site in anticipation of the permanent extraction operation. As part of this preparation, the well had been lined and sealed with cement. Before the *Deepwater Horizon* departed, this cement failed, resulting in the high-pressure release of gas, oil, and other fluids. The

---

[1] The well was also co-owned by MOEX Offshore 2007, LLC, which has settled with the government and is not party to this appeal.

[2] The vessel was owned or operated by various Transocean entities, including Transocean Deepwater, Inc., Transocean Offshore Deepwater Drilling, Inc., Transocean Holdings, LLC, and Triton Asset Leasing GmbH (collectively "Transocean"). These entities were originally named as defendants, but have settled with the government.

No. 12-30883

blowout preventer also failed, thus allowing these fluids to burst from the well, flowing up through the riser and onto the deck of the *Deepwater Horizon*. The oil and gas subsequently caught fire, and the ensuing blaze capsized the *Deepwater Horizon*, which was still connected to the well via the riser. The strain from the sinking vessel severed the riser, and for nearly three months oil flowed continuously through the broken riser and into the Gulf of Mexico. Authorities eventually installed a cap over what remained of the riser, and oil continued to leak for two days, with the well finally sealed on July 15, 2010.

Following the incident, the federal government filed the present action, seeking civil penalties under § 311 of the Clean Water Act, which mandates the assessment of fines on the owners or operators of any vessel or facility "from which oil or a hazardous substance is discharged."[3] The government then moved for summary judgment on several issues, including the well owners' civil-penalty liability for any "subsurface" discharge of oil. Anadarko filed a cross-motion for summary judgment on the same issue, arguing that the subsurface discharge emanated from the riser owned by Transocean, and thus that the oil was not discharged from any facility owned or operated by Anadarko or BP. Holding that discharge is the point where "uncontrolled movement" begins, the court concluded that the oil released from the well via the third party's broken riser was a discharge from the well. *In re Oil Spill*, 844 F. Supp. 2d at 758, 761. Because Anadarko and BP did not contest their ownership of the well, the district court then entered summary judgment in favor of the Government. *Id.* at 762. Anadarko and BP filed a timely appeal.

---

[3] 33 U.S.C. § 1321(a)(7)(A). All statutory references are to the 2006 edition of the U.S. Code. The government named a total of eight defendants and also sought reimbursement for clean-up costs pursuant to the Oil Pollution Act, 33 U.S.C. § 2702. These other parties and claims are not presently at bar.

No. 12-30883

## II.

We review summary judgment *de novo*, applying the same standard as the district court. *Bd. of Miss. Levee Comm'rs v. United States EPA*, 674 F.3d 409, 417 (5th Cir. 2012); *see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). Summary judgment is proper when the pleadings and other materials on file indicate that "there is no genuine dispute as to any material fact and that the moving party is entitled to judgment as a matter of law." FED R. CIV. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 323–25 (1986). We are not bound by the district court's analysis, and are free to affirm on any basis raised below and supported by the record. *United States v. Ho*, 311 F.3d 589, 602 n.12 (5th Cir. 2002).

## III.

The Clean Water Act is "not a model of clarity."[4] In its current form, the Act is the result of over a century of successive statutory schemes and amendments.[5] Yet it is, in some respects, not overly complex. The legislation attempts to eliminate the introduction of any kind of pollutant—everything from paint and pesticides to rocks and dirt—into the waters of the United States. 33 U.S.C. §§ 1251(a), 1362(6). The Act does so by creating a regulatory framework and then prohibiting any discharge in violation of the regulations. *See* 33 U.S.C. §§ 1252, 1311–1313, 1316–17, 1319, 1329, 1342. Because of the heightened potential for "environmental disaster" resulting from the release of oil or hazardous waste, 33 U.S.C. § 1321 establishes increased fines for the discharge of these pollutants. *See* S. Rep. No. 92-414 (1972), *reprinted in* 1972 U.S.C.C.A.N. 3668, 3732 (referring to possible disaster).

---

[4] *Atl. States Legal Found., Inc. v. Tyson Foods, Inc.*, 897 F.2d 1128, 1137 (11th Cir. 1990); *accord Platte Pipe Line Co. v. United States*, 846 F.2d 610, 611 (10th Cir. 1988).

[5] Discharge into U.S. waters was first prohibited by the Rivers and Harbors Appropriation Act of 1899, 30 Stat. 1121 (codified as amended at 33 U.S.C. § 401, *et seq.*).

No. 12-30883

Specifically, the section prohibits the "discharge of oil or hazardous substances (i) into or upon the navigable waters of the United States, adjoining shorelines, or into or upon the waters of the contiguous zone . . . in such quantities as may be harmful," except under circumstances not implicated by the present case.  33 U.S.C. § 1321(b)(3).  The section further provides that:

> Any person who is the owner, operator, or person in charge of any vessel, onshore facility, or offshore facility from which oil or a hazardous substance is discharged in violation of [33 U.S.C. § 1321(b)(3)] shall be subject to a civil penalty in an amount up to $25,000 per day of violation or an amount up to $1,000 per barrel of oil or unit of reportable quantity of hazardous substances discharged.

*Id.* § 1321(b)(7)(A); *see also* 33 C.F.R. § 27.3 (2006) (indicating dollar amounts as increased by regulation).  In the instant case, no one denies that there has been a discharge of harmful quantities of oil into navigable waters.  Anadarko and BP further stipulate that the well is an offshore facility, and that they are the owners of that facility.[6]  The only question, then, is whether it is beyond factual dispute that the well is a facility "from which" the harmful quantity of oil was discharged.  We find no dispute as to the question.

Discharge is not defined for the purposes of this section, but is instead illustrated by a list of examples.  Discharge "includes, but is not limited to, any spilling, leaking, pumping, pouring, emitting, emptying or dumping[.]"  33 U.S.C. § 1321(a)(2).  Each of these statutory examples denotes the loss of controlled confinement.  Similarly, the ordinary use of "discharge" refers to a fluid "flow[ing] out from where it has been confined."[7]  Accordingly, a vessel or

---

[6] The government argues that BP was also an operator of the *Deepwater Horizon*.  BP disagrees.  Because we find Anadarko and BP liable as owners of the well, we do not reach this question.

[7] *Discharge*, Oxford Dictionaries Online, U.S. Edition, http://www.oxforddictionaries.com/us/definition/american_english/discharge (last visited Feb. 24, 2014).  We further note that Congress intended for the section to apply to "classic spill" situations, 124 Cong. Rec. 37502 (1978), and dictionaries generally define a spill in

facility is a point "from which oil or a hazardous substance is discharged" if it is a point at which controlled confinement is lost. Turning to the facts, we find no dispute as to whether the well is such a facility. The parties stipulate that cement had been deposited at the well. There is no genuine dispute that controlled confinement was lost when this cement failed—the defendants do not contest the cement's failure, and they concede that oil then "escaped" and "flowed freely" from the well and ultimately into navigable waters. And although the defendants argue that the blowout preventer should have engaged and prevented the progression of the blowout, the need for this intervention only underscores the extent to which the oil was already unconfined and flowing freely. Accordingly, we find that the well is a facility from which oil was discharged in violation of 33 U.S.C. § 1321(b)(3).

It is immaterial that the oil flowed through parts of the vessel before entering the Gulf of Mexico. Anadarko argues that discharge is the point at which oil "enters the marine environment."[8] Yet Anadarko provides no relevant legal authority in support of the proffered interpretation. Nor does our research reveal any. On the contrary, it seems well settled that the section proscribes any discharge of oil that ultimately flows "into or upon . . . navigable waters," irrespective of the path traversed by the discharged oil.[9] For example,

---

terms of a loss or exit from a container. *See, e.g.*, *Spill*, Oxford English Dictionary Online, http://www.oed.com/view/Entry/186634 (subscription required) (last visited February 20, 2014) ("to allow or cause (a liquid) to fall, pour, or run out (esp. over the edge of the containing vessel)"); *Spill*, Merriam-Webster Online, http://www.merriam-webster.com/dictionary/spill (last visited February 24, 2014) ("to cause or allow (something) to fall, flow, or run over the edge of a container").

[8] Counsel used this phrase at oral argument. Similarly, the briefs argue that discharge denotes "direct" or "immediate" release into water. None of these proposed standards is consistent with existing law.

[9] 33 U.S.C. § 1321(b)(3); *see also Pepperell Assocs. v. United States EPA*, 246 F.3d 15 (1st Cir. 2001) (administrative penalties under 33 U.S.C. § 1321) (oil traversed third-party culvert); *Union Petroleum Corp. v. United States*, 651 F.2d 734 (Ct. Cl. 1981) (reimbursement provision under 33 U.S.C. § 1321) (oil ran across third-party rail line); *Pryor Oil Co., Inc. v.*

a discharge of oil violates the section even where the oil flows over a rail yard or hillside before reaching water. *See generally Union Petroleum Corp. v. United States*, 651 F.2d 734 (Ct. Cl. 1981); *Pryor Oil Co., Inc. v. United States*, 299 F. Supp. 2d 804 (E.D. Tenn. 2003). Similarly, the Environmental Protection Agency fined a factory owner for oil that spilled from a boiler gasket, into an industrial drain, through a conduit, and eventually into a creek. *See generally Pepperell Assocs. v. United States EPA*, 246 F.3d 15 (1st Cir. 2001). The First Circuit ultimately denied review of the case, finding the agency's decision reasonable. *Id*. at 30. So oil need not flow from a facility directly into navigable waters to give rise to civil-penalty liability under 33 U.S.C. § 1321.

Nor is liability precluded by the fact that the property traversed by the oil was owned by a third party. The *Pepperell* factory owner was held liable for his facility's discharge even though the oil had traveled through a third party's conduit before reaching water. *Id*. at 20. Likewise, when spilled oil subsequently traverses municipal sewers or ditches, liability is imposed upon the owner of the facility where the oil was first discharged, and not on the owner of the municipal facilities. *See generally In re D&L Energy, Inc.*, V-W-13 C-006 (EPA ALJ Feb. 27, 2013) (unpublished). In one recent incident, EPA authorities discovered that oil and brine were being released from an oil exploration site. *In re D&L Energy, Inc.*, V-W-13 C-006, at 2. Authorities found that a nearby river was polluted with oil and that a tributary was "impacted with oil at least a foot deep." *Id*. Upon further investigation, they realized that fluids from the drilling site were flowing through a municipal

---

*United States*, 299 F. Supp. 2d 804 (E.D. Tenn. 2003) (action under 33 U.S.C. § 1321(c)) (oil "ran down hillside"); *In re D&L Energy, Inc.*, V-W-13 C-006 (EPA ALJ Feb. 27, 2013) (administrative penalties under 33 U.S.C. § 1321) (unpublished) (pollutant traversed storm sewer); *In re Philadelphia Macaroni Co.*, CWA-III-187 (EPA ALJ May 28, 1998) (administrative penalties under 33 U.S.C. § 1321) (unpublished) (oil traversed field and ran into unnamed creek).

sewer, into a creek, and eventually to the Mahoning River. *Id.* The agency found the drilling site's owner liable, notwithstanding the fact that the oil flowed through third-party facilities before reaching water. *Id.* Indeed, we are aware of no case in which a court or administrative agency exempted a defendant from liability on account of the path traversed by discharged oil. The well owners' liability is thus unaffected by the fact that the oil traversed part of Transocean's vessel before entering the Gulf of Mexico.

We recognize that the aforementioned incidents involved blameless third parties, whereas here the owner or operator of the *Deepwater Horizon* might have contributed to the discharge. By all accounts, if the vessel's blowout preventer had functioned properly, the oil would not have entered navigable waters in violation of the Clean Water Act. The defendants therefore reason that liability is properly imposed upon the owner or operator of the *Deepwater Horizon.* Yet it is well established that this section of the Clean Water Act leaves no room for civil-penalty defendants to shift liability via allegations of third-party fault. *See United States v. Tex-Tow, Inc.*, 589 F.2d 1310, 1314 (7th Cir. 1978) (holding defendant liable for penalty notwithstanding fault of a third party). Early in the implementation of the Act's regulatory framework, there was some uncertainty as to where and how the law should apply. It was not uncommon for defendants to argue that the statute should not apply where a pollutant is accidentally discharged, or where a third party causes the discharge. *See Sierra Club v. Abston Const. Co., Inc.*, 620 F.2d 41, 45 (5th Cir. 1980) (summarizing early cases). Courts, however, now acknowledge that civil-penalty liability under 33 U.S.C. § 1321 arises irrespective of knowledge, intent, or fault.[10] In fact, courts have consistently rejected attempts to shift

---

[10] *Kelly v. United States EPA*, 203 F.3d 519, 522 (7th Cir. 2000) ("Civil liability under the Clean Water Act, therefore, is strict."); *United States v. Coastal States Crude Gathering Co.*, 643 F.2d 1125, 1127 (5th Cir. Unit A Apr. 1981) (referring to civil penalties in what is

liability on the basis of shared fault, instead choosing to consider any contributing cause as a mitigating factor at penalty calculation.[11]  This Court, in particular, recognizes the section as "an absolute liability system with limited exceptions, which are to be narrowly construed."  *United States v. W. of Eng. Ship Owner's Mut. Prot. & Indem.*, 872 F.2d 1192, 1196 (5th Cir. 1989). And although 33 U.S.C. § 1321 includes a third-party-fault exception for removal-cost liability, it includes no such exception for civil-penalty liability.[12] That being the case, any culpability on the part of the *Deepwater Horizon*'s operators does not exempt the well owners from the liability at issue here.

After reviewing the record and the law, we find no genuine dispute as to the defendants' liability for civil penalties pursuant to § 311 of the Clean Water Act.  As explained herein, it is undisputed that the well's cement failed, resulting in the loss of controlled confinement of oil such that the oil ultimately entered navigable waters.  The well is therefore a facility "from which oil or a hazardous substance was discharged" "into or upon the navigable waters of the United States."  33 U.S.C. §§ 1321(a)(2), (b)(3), (b)(7)(A).  Anadarko and BP do not dispute their ownership of the well.  Therefore, by the express terms of the statute, Anadarko and BP "shall be subject to a civil penalty" calculated in

---

now 33 U.S.C. § 1321(b)(6), which uses the same liability standard as § 1321(b)(7)); *Sierra Club, Mineral Policy Ctr. v. El Paso Gold Mines, Inc.*, No. A. 01 PC 2163 OES, 2002 WL 33932715, at *11 (D. Colo. Nov. 15, 2002) (rejecting argument that a defendant must "actively" contribute to a spill before liability may be imposed).

[11] *E.g.*, *Coastal States Crude*, 643 F.2d at 1128 (reducing penalty in enforcement order due to lack of fault); *United States v. Egan Marine Corp.*, No. 08 C 3160, 2011 WL 8144393, at *5–6 (N.D. Ill. Oct. 13, 2011) (explaining that the majority of circuits have concluded that the imposition of penalties is mandatory); *United States v. General Motors Corp.*, 403 F. Supp. 1151, 1165 (D. Conn. 1975) (finding that liability was mandatory but fine of $1 was appropriate where no fault shown); *cf. United States v. Scruggs*, No. G-06-776, 2009 WL 500608, at *6 (S.D. Tex. Feb. 26 2009) (imposing fine of $65,000 where over $1 million was authorized by statute).

[12] *Compare* 33 U.S.C. § 1321(g) (allowing subrogation of removal costs where discharge was "caused solely by an act or omission of a third party"), *with id*. § 1321(b) (making no mention that such an option is available vis-à-vis civil-penalty liability).

No. 12-30883

accordance with statutory and regulatory guidelines. *Id.* § 1321(b)(7)(A). This liability is unaffected by the path traversed by the discharged oil. Nor is liability precluded by any culpability on the part of the vessel's owner or operator.

## IV.

For the reasons stated, we AFFIRM the grant of partial summary judgment with respect to the well owners' liability for civil penalties pursuant to 33 U.S.C. § 1321(b)(7)(A).[13]

---

[13] We do not adopt the district court's interpretation of § 1321(b)(7)(A) to the extent that such an interpretation differs from our own. Further, we express no opinion as to any other issues addressed in the district court's order.