JONES, Circuit Judge,
dissenting.
I respectfully disagree with the majority opinion, which assists the United States Chemical Safety Board (“CSB”) in expanding its jurisdiction into novel territory disallowed by Congress. This is the first time, in twenty years after CSB was ordained, that the agency has sought to investigate in connection with an offshore oil spill.[1] The majority’s interpretation of the Clean Air Act disregards the plain meaning of words and grammar and the most fundamental maritime concept, which is *497 the definition of a vessel. To summarize my view: the Mobile Offshore Drilling Unit Deep water Horizon was a vessel, not a “stationary source” pursuant to 42 U.S.C. § 7412(r)(2)(C), and the Macondo Well blowout caused a “marine oil spill,” 42 U.S.C. § 7412(r)(6)(E), which excluded the blowout from CSB jurisdiction either in toto or because the NTSB was empowered to investigate.
Because the majority opinion aptly describes the background of this controversy, only a bit need be repeated here. Trans-ocean objects to administrative subpoenas served by CSB when the agency instituted an investigation following the Deep water Horizon oil spill disaster. The standard for challenging an administrative subpoena is strict: courts may only interfere with the process in a limited number of circumstances, one of which arises when the agency plainly lacks jurisdiction. See Burlington N. R. Co. v. Office of Inspector Gen., R.R. Ret. Bd., 983 F.2d 631, 638 (5th Cir.1993); see also United States v. Powell, 379 U.S. 48, 57-58, 85 S.Ct. 248, 255, 13 L.Ed.2d 112 (1964). CSB was created as a Clean Air Act counterpart to the National Traffic Safety Board (“NTSB”) and charged with investigating unanticipated releases of hazardous substances into the ambient air from “stationary sources.” 42 U.S.C. § 7412(r)(2)(C) (defining the term “accidental release” found in 42 U.S.C. § 7412(r)(6)(C)(i)). The term “stationary sources,” includes “any buildings, structures, equipment, installations or substance emitting stationary activities.... ” 42 U.S.C. § 7412(r)(2)(C). The Board may follow up an investigation by recommending regulatory measures to avert future releases into the air. NTSB, in contrast, investigates “transportation-related” aviation, highway, rail, marine or pipeline accidents and also makes regulatory recommendations to improve safety. 49 U.S.C. § 1131(a)(1)(F). Not only CSB and NTSB, but numerous other agencies either routinely or at special request investigate accidents with significant public impact. As a result, the statute that created CSB requires this agency to cooperate with or take a second seat to such agencies:
The Board shall coordinate its activities with investigations and studies conducted by other agencies of the United States having a responsibility to protect public health and safety. The Board shall enter into a memorandum of understanding with the National Transportation Safety Board to assure coordination of functions and to limit duplication of activities which shall designate the National Transportation Safety Board as the lead agency for the investigation of releases which are transportation related. The Board shall not be authorized to investigate marine oil spills, which the National Transportation Safety Board is authorized to investigate. The Board shall enter into a memorandum of understanding with the Occupational Safety and Health Administration so as to limit duplication of activities. In no event shall the Board forego an investigation where an accidental release causes a fatality or serious injury among the general public, or had the potential to cause substantial property damage or a number of deaths or injuries among the general public.
42 U.S.C. § 7412(r)(6)(E).
Under this provision, if the Deepwater Horizon was not a stationary source, CSB lacked the authority to investigate. Likewise, if the disaster was a marine oil spill, or by even the majority’s construction a marine oil spill that NTSB was authorized to investigate, CSB lacks authority. I will discuss each of these limits on CSB’s authority in turn.
*498 1. Can a vessel be a “stationary source”?
This question seems to answer itself. A “vessel,” as defined in federal law, is a device capable of providing transportation on water. 1 U.S.C. § 3; Stewart v. Dutra Construction Co., 543 U.S. 481, 495, 125 S.Ct. 1118, 1128, 160 L.Ed.2d 932 (2005). “Stationary” means “fixed in a station, course or mode; unchanging, stable, static.” Webster’s Third New International Dictionary 2229 (1986). Not only does “stationary” modify all of the following terms, but the following illustrations of “stationary sources” are inherently fixed and immobile (“buildings, structures, equipment, installations ... ”). A vessel capable of transportation is not comparable to these illustrated sources and cannot be a stationary source of emissions. To so conclude erases the line between stationary and mobile sources.
But the majority determines otherwise. First, the majority opinion acknowledges that the Deepwater Horizon is a vessel according to Coast Guard regulations, Supreme Court authority, longstanding case law in this circuit, and multiple decisions relating to this oil spill disaster. However, the majority contends, what is good law for maritime purposes does not govern the Clean Air Act’s statutory definition. Alternatively, the majority holds, the Deep-water Horizon was in fact “stationary” when the blowout and oil spill occurred, because its dynamic positioning devices kept the unit essentially in place without anchors securing it to the ocean floor while it engaged in drilling operations. Finally, the majority posits that the “Macondo drilling installation as a whole,” allegedly encompassing the drill string, riser, blowout preventer, wellhead and casing, all of which stretch over a mile down and into the Outer Continental Shelf seabed, maintained a stationary position.
The majority’s fundamental error lies in distorting “stationary” from its ordinary meaning, as required by the tools of statutory interpretation, Castro v. Collecto, Inc., 634 F.3d 779, 786 (5th Cir.2011). The Deepwater Horizon was a “vessel” from a common sense standpoint. Technically, it was a “dynamically-positioned semi-submersible drilling vessel” that was afloat and under movement at the time of the blowout. See In re Oil Spill by the Oil Rig Deepwater Horizon in the Gulf of Mexico, on April 20, 2010, 808 F.Supp.2d 943, 950 (E.D.La.2011), aff'd, sub nom. In re Deepwater Horizon, 745 F.3d 157 (5th Cir.2014). It navigated, transported personnel and equipment, and continued navigating in order to hold its position in the sea against currents and waves. That it was able to employ advanced technology to accomplish its purpose, rather than sails or rudders, does not detract from its status as a vessel; hence, its status as a “mobile” offshore drilling unit. At all times, it had a navigational crew in addition to a drilling crew. The issue here is not so much whether the Clean Air Act definition must slavishly follow the course of maritime law, but also whether calling this “mobile” offshore drilling a “vessel” conflicts with the ordinary meaning of a “stationary source.”
Virtually every opinion of this court relating to the Deepwater Horizon oil spill disaster has referred to the MODU as a “vessel,”[2] and in so doing we have followed a path charted in this court for decades. See, e.g., Trico Marine Operators, Inc. v. Falcon Drilling Co., 116 F.3d 159, 161 (5th Cir.1997); Dougherty v. San *499 ta Fe Marine, Inc., 698 F.2d 232, 234 (5th Cir.1983); Offshore Co. v. Robison, 266 F.2d 769, 779 (5th Cir.1959). Our decisions reflect how maritime activities have evolved in the last fifty years to include new and ever-more-sophisticated watercraft. The Supreme Court has also defined “vessels” expansively as “any watercraft practically capable of maritime transportation.” Stewart v. Dutra Constr. Co., 543 U.S. 481, 497, 125 S.Ct. 1118, 1128, 160 L.Ed.2d 932 (2005). Also compelling is the Coast Guard’s responsibility for regulating mobile offshore drilling units, which recently led it to conclude that if anything, their status as vessels should be fortified. Memorandum from S.D. Poulin, U.S. Coast Guard, to CG-5, Potential Legal Issues Associated With Vessels Employing Dynamic Positioning Systems 10 (Feb. 11, 2011). Why, in the face of ordinary meaning and this body of consistent authority, should a court be able to hold that the Deepwater Horizon, although a “vessel,” was a “stationary source”? This is like holding a pig is a pony. The language of the statute is broad but it isn’t limitless. Either “stationary” means something related to immobility, or judges are making up a new meaning.
The majority’s other reasons for holding that the Deepwater Horizon was a “stationary source” also defy common sense. The majority’s description of the sophisticated dynamic positioning system used by Mobile Offshore Drilling Units like the Deepwater Horizon is flawed and, worse, leads to the possibility that CSB jurisdiction will turn on fact-specific determinations of “stationary” versus “mobile” sources. Factually, it is true that the thrusters operated by the MODU’s navigational crew kept the unit positioned substantially over the wellhead, but the unit continues at all times to move with the wave motions. Essentially, the thrusters permit the unit to tread water. Anyone treading water, however, is constantly in motion, and so was the Deepwater Horizon. Likewise, a helicopter may hover in place over the ground, but it is always in motion, and I suppose even CSB would not contend it is a “stationary source.”
Even more unfortunate is the resort to fact-specific reasoning to determine that this vessel is a “stationary source.” Since the statute draws a dichotomy between the CSB’s responsibility for “stationary source” accidental air releases and NTSB’s jurisdiction over “transportation-related” disasters, the CSB’s aggressive attempt to blur the dichotomy is at odds with the statute itself. (As will be seen, CSB is horning into the primary jurisdiction of NTSB by urging this court to narrow NTSB’s scope as well.) Of course, the statute contemplates splitting duties between NTSB and CSB in appropriate cases, and in such cases requiring CSB to yield to NTSB, but one can easily envision overlaps without CSB’s having to mutilate the definition of “stationary.” For instance, if a chemical tank exploded at a rail yard and emitted hazardous fumes, there could be a question whether the cause was transportation-related or due to a stationary source nearby. Similarly, toxic substances or fuel used in connection with aircraft and aircraft maintenance might ignite at an aviation center, emitting hazardous air pollutants. The cause of either accident could be “stationary” or “transportation-related.” In the Deepwater Horizon disaster, however, CSB contends that the vessel itself was the “stationary source” because it was dynamically positioned. Henceforth, the same argument could result in fully overlapping CSB/ NTSB authority whenever a vehicle, aircraft, or vessel happens to be temporarily moored at the time of an unanticipated toxic air emission.
*500 The majority’s final rationale for calling this mobile offshore drilling unit a “stationary source” is to embed it in an “installation as a whole” encompassing the Macondo well and the well’s casing[3] and wellhead,[4] which are located underneath or at the level of the seabed. This bottom-up logic is erroneous for two reasons.
First, common sense tells us that the five thousand feet of drill string, plus riser and blowout preventer leading from the MODU to the well hardly created a stationary island 50 miles off the United States coast in the Gulf of Mexico. The MODU Deepwater Horizon and its appurtenances are connected to the seabed.[5] But it is quite inconsistent to say that the “installation” is stationary when the only reason for its being stationary is that the vessel uses dynamic positioning thrusters and is constantly in motion to maintain stability over the wellhead. Broadening the term “installation” to denominate the Macondo well and the Deepwater Horizon a “stationary source” is nothing more than rhetorical legerdemain designed to obfuscate the limits on CSB’s jurisdiction.
Second, both statutory law and well settled case law have distinguished between fixed and mobile drilling platforms and offshore devices for decades. The Outer Continental Shelf Lands Act distinguishes between “artificial islands” and vessels in order to demarcate between the application of federal or state law and admiralty law. See 43 U.S.C. § 1333(1) (distinguishing between artificial islands subject to the choice of law provisions of 43 U.S.C. § 1333(2)(A) and vessels not subject to such provisions); see also Herb’s Welding, Inc. v. Gray, 470 U.S. 414, 421-23, 105 S.Ct. 1421, 1426-27, 84 L.Ed.2d 406 (1985) (outlining the division between artificial islands subject to “borrowed state law” and other areas subject to maritime law). Artificial islands are drilling or production platforms attached to the seabed in some way and thus fully immobile, while other special purpose structures “such as jack-up rigs, submersible drilling barges, derrick barges, spud barges, and others are vessels as a matter of law.” Manuel v. P.A.W. Drilling & Well Service, Inc., 135 F.3d 344, 347 (5th Cir.1998). It is bedrock that “[w]e assume that Congress is aware of existing law when it passes legislation.” Miles v. Apex Marine Corp., 498 U.S. 19, 32, 111 S.Ct. 317, 112 L.Ed.2d 275 (1990); see also Goodyear Atomic Corp. v. Miller, 486 U.S. 174, 184-85, 108 S.Ct. 1704, 1712, 100 L.Ed.2d 158 (1988) (“We generally presume that Congress is knowledgeable about existing law pertinent to the legislation it enacts.”). Setting aside the “marine oil spill exclusion” discussed next, the CSB’s jurisdiction over artificial islands as “stationary” sources fits comfortably within the OCSLA dichotomy and background law. Just as clearly, characterizing the *501 MODU Deepwater Horizon with or without the Macondo well as “stationary” does not. The majority’s deviation from background law violates the ordinary interpretive presumption as well as the facts.
2. Can the “marine oil spill exclusion” be excluded?
It is unnecessary to wade into the parties’ “comma, which” dispute to reach a sensible interpretation of 42 U.S.C. § 7412(r)(6)(C)(i), which excludes marine oil spills from CSB’s investigative authority. This provision as a whole expresses Congress’s recognition that other agencies have regulatory jurisdiction over hazardous releases into the ambient air. Consequently, CSB has to cooperate and coordinate with such agencies in furtherance of public health and safety. Foreseeing significant potential overlaps, Congress paid particular attention to the interrelation of CSB with two agencies: the OSHA and NTSB. NTSB, relevant here, is deemed the lead agency for releases “which” are “transportation related.” We know from the Supreme Court that “related-to” language is enabling in the broadest sense. Ingersoll-Rand Co. v. McClendon, 498 U.S. 133, 138-39, 111 S.Ct. 478, 482-83, 112 L.Ed.2d 474 (1990) (discussing the breadth of the “related-to” pre-emption language in § 514(a) of ERISA). The CSB, moreover, “shall not be authorized to investigate marine oil spills, which the National Transportation Safety Board is authorized to investigate.” Nevertheless, “[i]n no event shall the [CSB] forego an investigation where an accidental release causes a fatality or serious injury among the general public or had the potential to cause substantial property damage or a number of deaths or injuries among the general public.” I part company with the majority on the applicability of the “marine oil spill exclusion” and their interpretation of the “danger to the public” catchall language.
Taking the “marine oil spill exclusion” first, even if this language is read holistically and narrowly to exclude CSB from only those marine oil spills “that” the NTSB may investigate, this marine oil spill was “related to” transportation through the movement of hydrocarbons from the well through the drill string to the Deep-water Horizon[6] and by virtue of the vessel’s constant movement. On the face of the provision, where NTSB was authorized to investigate, CSB must recede. Curiously, however, to expand CSB jurisdiction, at the expense of the NTSB, the majority accepted two of CSB’s propositions: this oil spill disaster, the largest in American history, was not within the “marine oil spill exclusion,” and even if it was, NTSB lacked jurisdiction. These arguments are wrong. The first one would eviscerate the “marine oil spill exclusion” completely. The second erroneously limits NTSB’s authority.
Holding that the “marine oil spill exclusion” does not apply if hazardous substances were incidentally released into the air during a “marine oil spill” turns the exclusion on its head and renders it a nullity.[7] Virtually any offshore crude oil spill involves the emission of fumes, because petroleum produced from wells is “oil,” more technically, “[a] complex mixture of naturally hydrocarbon compounds found in rock.... [T]he term is generally used to refer to liquid crude oil. Impuri *502 ties, such as sulfur, oxygen and nitrogen are common in petroleum.” Petroleum, ScHLUMBEKGER OlLFIELD GLOSSARY, (last VÍS-ited Sept. 16, 2014), www.glossary.oilfield. slb.com/en/Terms/p/petroleum.aspx. The lighter hydrocarbons and impurities in crude oil readily evaporate into the air; as we all know, there is no smoking at gas pumps because of the volatility of hydrocarbons in “oil.” CSB’s attempt to separate these mixed hydrocarbons temporally from the oil spill disaster, by purporting to focus its investigation on the emission of fumes that ignited and exploded at the platform, is unrealistic. How unrealistic is confirmed by the scope of the agency’s subpoena at issue here: CSB called for all of the documents that Transocean turned over to all of the other investigating agencies concerning the blowout, explosion and oil spill. Why? Because the liquid and gaseous hydrocarbons all spewed from the well due to the same errors during the drilling process. The investigation cannot be limited to ambient air releases apart from the events that triggered the marine oil spill. This position is factually unsupportable.
Equally untenable is the holding that NTSB lacked authority to investigate this disaster. NTSB has jurisdiction over “any other accident related to the transportation of individuals or property when the [NTSB] decides—
(i) the accident is catastrophic;
(ii) the accident involves problems of a recurring character; or
(iii) the investigation of the accident would carry out this chapter.
49 U.S.C. § 1131(a)(1)(F). The majority fall back on their faulty conclusion that the oil spill disaster was not “transportation related.”[8] Remarkably, the majority must conclude that “[m]erely because a disaster involves a vessel does not mean that the disaster was necessarily related to transportation.” I have already explained why the MODU’s status as a vessel is disposi-tive of the “stationary source” argument; the factual and legal points made there apply even more clearly to this argument. The logical implication of the majority’s interpretation forbids NTSB to operate in its area of expertise when certain catastrophic disasters involve a temporarily immobile vehicle, airplane, train, vessel or pipeline activity. The settled legal interpretation of “related” forbids this artificial constraint.
Finally, the majority erroneously relies on CSB’s catchall investigative power over fatalities, serious injuries or property damages to “the general public.” 42 U.S.C. § 7412(r)(6)(E). The Deepwater Horizon’s crew were specialized oilfield or marine employees covered by OSHA, not “the general public.” To be sure, this catchall is an empowering provision, just as Section 1131(a)(1)(F) is empowering to the NTSB. Unlike the NTSB provision, which empowers transportation “related” investigations, CSB’s provision covers actual or potential injuries, fatalities or property damage to “the general public.” On the facts of this case, the provision is clearly inapplicable. CSB posits its jurisdiction only over the explosion on the MODU Deepwater Horizon that was occasioned by the release of volatile hydrocarbons from the well. The Macondo well was located 50 miles offshore of Louisiana. No one has ever claimed that injury occurred to “the gener *503 al public” onshore from releases into the ambient air. The term “public” is defined to mean “of, relating to, or affecting the people as an organized community.” Webster’s Third New International Dictionary 1836 (1986); see also Black’s Law Dictionary 1264 (8th ed.1999) (defining public as “[r]elating or belonging to an entire community”). The workers who tragically lost their lives in the vessel’s explosion are not, under this definition, “the general public.” Congress could have easily described CSB’s catchall jurisdiction by referring to “individuals” or “any person,” but it chose a different term.
Conclusion
This case strictly and properly concerns an agency’s statutory authority to issue subpoenas and conduct an investigation. The much broader ramifications of the decision should not, however, be overlooked. First, when Congress has delineated agency authority against clear background principles and with easily defined terms, the agency itself should not play havoc with the statute to expand its authority; an agency has a duty to follow its mandate but go no further. For the sake of maintaining limited government under the rule of law, courts must be vigilant to sanction improper administrative overreach. See, e.g., Util. Air Regulatory Grp. v. E.P.A., - U.S. -, 134 S.Ct. 2427, 2449, 189 L.Ed.2d 372 (2014) (holding that the EPA exceeded its statutory authority). Second, contrary to some fears expressed about the consequences of holding CSB unable to investigate the Deepwater Horizon disaster, there were at least seventeen investigations, including major reports by a Presidential Commission and the Coast Guard. See Exec. Order No. 13,543, 75 Fed.Reg. 29,397 (May 21, 2010) (establishing the National Commission on the BP Deepwater Horizon Oil Spill and Offshore Drilling). The Coast Guard, in fact, was required to “make an investigation and public report on each major fire and each major oil spillage occurring as a result of’ exploration, development and production of minerals-from the OCS. 43 U.S.C. § 1348(d)(1). There is no dearth of proper investigation to protect public safety. Third, as a result of being deemed by this opinion “stationary sources,” nearly all non-standard offshore vessels involved in oil and gas production on the OCS will become subject to Clean Air Act regulation and reports in addition to “all of the regulatory requirements of ‘traditional’ vessels” imposed by the Coast Guard. See 42 U.S.C. § 7412(r)(7)(B)(iii); Memorandum from S.D. Poulin, U.S. Coast Guard, to CG-5, Potential Legal Issues Associated With Vessels Employing Dynamic Positioning Systems 10 (Feb. 11, 2011).
For all these reasons, I respectfully dissent.

. Inside OSHA, Vol. 17, No. 13, at 6 (June 29, 2010).

. See, e.g., In re Deepwater Horizon, 753 F.3d 570, 571 (5th Cir.2014); In re Deepwater Horizon, 745 F.3d 157, 164 (5th Cir.2014); In re Deepwater Horizon, 739 F.3d 790, 796 (5th Cir.2014) (labeling the MODU as a vessel).

. Casing, Schlumberger Oilfield Glossary, (last visited Sept. 16, 2014), http://www. glossaiy.oilfield.slb.com/en/Terms/c/casing. aspx ("Large-diameter pipe lowered into an open-hole and cemented in place.”).

. Wellhead, Schlumberger Oilfield Glossary, (last visited Sept. 16, 2014), http://www. glossary.oilfield.slb.com/en/Terms/w/wellhead. aspx ("The system of spools, valves and assorted adapters that provide pressure control of a production well.”).

. The majority's bottom-up logic is hard to square with a recent opinion of this Court that referred to the blowout preventer and riser as "appurtenances” of the vessel Deep-water Horizon, and the vessel and its appurtenances as separate from the well. In re Deepwater Horizon, 753 F.3d 570, 571 (5th Cir.2014); Jerome B. Grubart, Inc. v. Great Lakes Dredge & Dock Co., 513 U.S. 527, 535, 115 S.Ct. 1043, 1049, 130 L.Ed.2d 1024 (1995) ( Maritime law ... ordinarily treats an "appurtenance” attached to a vessel in navigable waters as part of the vessel itself.).

. Recall that NTSB is also charged to investigate pipeline disasters.

. It is an established principle of statutory interpretation that "[w]here possible, every word in a statute should be given meaning.” G.M. Trading Corp. v. C.I.R., 121 F.3d 977, 981 (5th Cir.1997).

. The present case involves an accident on the Outer Continental Shelf and is therefore unlike NTSB v. Carnival Cruise Lines, Inc., 723 F.Supp. 1488, 1493 (S.D.Fla.1989), which dealt with an "extraterritorial investigation” outside of U.S. territory. Since 43 U.S.C. § 1331(a) makes clear that the Outer Continental Shelf is under U.S. law, any investigation would not be extraterritorial.