# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

———————

No. 12-30883

———————

United States Court of Appeals
Fifth Circuit

**FILED**

November 5, 2014

Lyle W. Cayce
Clerk

IN RE: DEEPWATER HORIZON

_____

UNITED STATES OF AMERICA,

Plaintiff - Appellee

v.

B.P. EXPLORATION & PRODUCTION, INCORPORATED; ANADARKO
PETROLEUM CORPORATION,

Defendants - Appellants

———————————

Appeals from the United States District Court
for the Eastern District of Louisiana

———————————

Before KING, BENAVIDES, and DENNIS, Circuit Judges.

PER CURIAM:

Appellants B.P. Exploration & Production, Inc. ("BP") and Anadarko
Petroleum Corporation ("Anadarko") have filed petitions for en banc rehearing
of our judgment affirming the lower court's grant of partial summary
judgment. The en banc petitions remain pending. Although the parties have
not filed separate petitions for panel rehearing, BP has "request[ed] that the
panel reconsider its analysis." BP Pet. Reh'g 9. We have done so, and we have
also considered the arguments raised by Anadarko, which contends, *inter alia*,
that the panel opinion is "likely to sow error in the ongoing trial below."

No. 12-30883

Anadarko Pet. Reh'g 13.  We disagree with this characterization of our opinion, but, for the sake of clarity, we address some of the arguments raised in the petitions for rehearing en banc.  For the reasons discussed below, Appellants' arguments fail to persuade us that we erred or need to alter our decision to affirm the district court's grant of partial summary judgment.

This case involves the federal government's civil enforcement action under Section 311 of the Clean Water Act (CWA), 33 U.S.C. § 1321(b)(7)(A), stemming from the 2010 *Deepwater Horizon* oil spill in the Gulf of Mexico. Section 311, a strict liability provision, mandates the assessment of fines on the owners or operators of any vessel or facility "from which oil or a hazardous substance is discharged."  *Id.*  In the panel opinion, we affirmed summary judgment on the issue of Appellants' liability under that provision. Interpreting the CWA according to its plain terms, we held that "a vessel or facility is a point 'from which oil or a hazardous substance is discharged' if it is a point at which controlled confinement is lost."  *In re Deepwater Horizon*, 753 F.3d 570, 573 (5th Cir. 2014) (quoting 33 U.S.C. § 1321(b)(7)(A)).  We further determined that BP and Anadarko, as co-owners of the Macondo Well (the "well"), are liable under Section 311 because there was no dispute of material fact that controlled confinement of oil was lost in the well.

Appellants' various arguments challenging this holding can be grouped into two categories: those based on purported factual errors in the panel opinion, and those based on purported errors in the panel opinion's legal analysis.  We address each in turn.

## I.    Purported Factual Errors in the Panel Opinion

Anadarko first contends that the panel opinion was premised on a mistake of fact, pointing to the following sentence in the opinion's statement of facts: "As part of this preparation [for the *Deepwater Horizon*'s departure from the well site], the well had been lined and sealed with cement."  *In re Deepwater*

No. 12-30883

*Horizon*, 753 F.3d at 573.  Anadarko argues that, "[c]ontrary to the assumption of the Panel, all parties to this appeal agree that the cement never sealed off the well from the oil and gas in the rock formation beneath it."  Anadarko Pet. Reh'g 2.  Anadarko further contends that this purported factual error has created, and will continue to create, issues in the proceedings before the lower court.  Anadarko Pet. Reh'g 13.

We are doubtful that the panel opinion has created any confusion on this issue.  Nevertheless, we here clarify that the above statement was not intended to imply that the cement created a *successful* seal in the well.  Anadarko is correct that all parties agree—and the record is clear—that the cement job failed to prevent hydrocarbons—*e.g.*, oil—from migrating into the wellbore.  Indeed, in the sentence following the one at issue, we stated that, "[b]efore the *Deepwater Horizon* departed, this cement failed, resulting in the high-pressure release of gas, oil, and other fluids."  *In re Deepwater Horizon*, 753 F.3d at 571.  In any event, this issue is a red herring.  Whether the cement initially sealed the well was immaterial to the panel opinion's holding.  As discussed in more detail below, it is only the fact that the cement in the well ultimately failed to stop the flow of oil (regardless of whether the cement at any prior point functioned as expected), and that control was therefore lost in the well, that prompted our determination that the well was a point "from which oil or a hazardous substance [was] discharged."  33 U.S.C. § 1321(b)(7)(A).

Anadarko also argues that the panel's holding has effectively denied it its Seventh Amendment right to a jury trial, as Anadarko was not permitted to put forward evidence regarding where controlled confinement was lost.  However, the lower court placed no limit on the admissible evidence Anadarko could put forward in opposition to the Government's motion for summary judgment, and in support of its cross-motion for summary judgment, on the issue of Anadarko's Section 311 liability.  Moreover, in its summary judgment

No. 12-30883

briefing, Anadarko conceded that there were no disputes of material fact with respect to this issue. *See* No. 2:10-MD-2179, Doc. 5113-2.[1] Undoubtedly aware of this concession, Anadarko now contends that it could not have anticipated either the lower court's or the panel's "unprecedented" interpretations of Section 311—finding liability based on where "the uncontrolled movement of oil began," *In re Oil Spill by Oil Rig Deepwater Horizon in Gulf of Mexico, on Apr. 20, 2010*, 844 F. Supp. 2d 746, 758 (E.D. La. 2012), and where "controlled confinement [was] lost," *In re Deepwater Horizon*, 753 F.3d at 573, respectively. But in its summary judgment briefing before the lower court, Anadarko was aware that "control" of the oil might be at issue. In support of its argument that the oil was discharged from the *Deepwater Horizon*, Anadarko stated, "the owners and operators of the vessel . . . failed to *maintain control* of the Macondo Well, and as a result of that failure, hydrocarbons discharged from the vessel and its appurtenances into the Gulf of Mexico." No. 2:10-MD-2179, Doc. 5113-2, at 4 (emphasis added).[2]

In any event, there are no additional facts that would alter our conclusion that controlled confinement was lost in the well. As we stated in the panel opinion, the only facts material to this analysis are undisputed. First, there is no question that Anadarko and BP are co-owners of the well. Nor do Appellants dispute that, as a result of the cement's failure, oil flowed into the well and, eventually, into the Gulf of Mexico. Before the lower court, in their responses to the Government's statement of undisputed facts, Appellants conceded for the purposes of summary judgment that "the cement

---

[1] Anadarko did note that there may be disputed facts warranting a jury trial regarding the issue of whether Anadarko is an "owner, operator or person in charge" under 33 U.S.C. § 1321(b)(7)(A). *See* No. 2:10-MD-2179, Doc. 5113-2, at 2 n.2; Doc. 5280, at 10 n.7. But that issue was never before us.

[2] Indeed, Anadarko deemed this "factor . . . crucial to the resolution of these motions [for summary judgment]." No. 2:10-MD-2179, Doc. 5113-2, at 4.

job failed to prevent hydrocarbons in the formation from migrating into the wellbore." No. 2:10-MD-2179, Doc. 5113-3, at 5–6; *see also* Doc. 5124-1, at 2. Appellants further conceded that "[t]he Macondo well cement job was critical for maintaining *well control*." No. 2:10-MD-2179, Doc. 5124-1, at 2 (emphasis added); *see also* Doc. 5113-3, at 5 (stating that the "cement job was a means of maintaining well control").[3] Even in their petitions for rehearing, Appellants do not dispute these facts. However, Anadarko now argues that, because the cement never properly sealed the well, the well "could not have been the 'point at which controlled confinement' of oil was 'lost' because oil was never confined in the well to start."[4] Anadarko Suppl. Br. in Supp. of Pet. Reh'g 7. But that the cement—undisputedly placed in the well—failed to perform its function as a barrier to the flow of oil only underscores that controlled confinement was lost in the well.[5]

Both BP and Anadarko attempt to shift the focus to the *Deepwater Horizon* and its appurtenances (owned by the Transocean entities), arguing that control was lost either (1) when the blowout preventer failed, or (2) when the drilling mud (which Anadarko contends is an appurtenance of the Transocean vessel) was displaced with seawater, causing oil to enter the well. But, as discussed in more detail below, our determination that controlled confinement was lost in the well does not preclude the possibility that

---

[3] We note that federal regulations not at issue here, but addressed in subsequent proceedings in this case, require that well owners "take necessary precautions to keep wells under control at all times." 30 C.F.R. § 250.401; *see also* 30 C.F.R. § 250.420(a) (requiring that well owners' "casing and cementing programs . . . [p]revent the direct or indirect release of fluids from any stratum through the wellbore into offshore waters").

[4] It is worth noting that this argument would foreclose Appellants' separate argument, discussed below, that the blowout preventer—which also failed to perform its function of containing oil in the well—was a point at which controlled confinement was lost.

[5] Although Anadarko argues that "[a]t the temporary abandonment stage of a well, the well is not intended to 'control' or 'confine' oil," Anadarko Suppl. Br. in Supp. of Reh'g 6, it is nonetheless undisputed that the cement placed in the well was intended to do so.

controlled confinement was also lost elsewhere, an issue that we did not need to rule on.  Further, with respect to the drilling mud, there is no dispute that its removal "allowed oil to escape from the formation" and *into the well*. Anadarko Suppl. Br. in Supp. of Pet. Reh'g 7.  Again, the focus is on the well, and we come back to the loss of controlled confinement in the well.   Moreover, the blowout preventer was not the first and only barrier to the discharge of oil. Rather, in BP's own words, "a [blowout preventer] . . . 'operates as a failsafe device designed to stop a blowout from *progressing* and, *in the event of loss of control*, seal the well and stop the flow of oil.'"  BP Blue Br. 11–12 (emphasis added) (quoting *Bricklayers & Masons Local Union No. 5 Ohio Pension Fund v. Transocean Ltd.*, 866 F. Supp. 2d 223, 230–31 (S.D.N.Y. 2012)).  Thus, as BP implies, a blowout preventer becomes necessary only when control of the oil has already been lost.   Indeed, by contending that the court erred in determining "that controlled confinement of oil was *irretrievably* lost in the well," BP Suppl. Br. in Supp. of Pet. Reh'g 8, BP appears to concede that controlled confinement was *initially* lost in the well.

Therefore, Appellants' contention that controlled confinement was not lost in the well is belied by the undisputed facts in the record and by Appellants' own admissions.

## II.    Purported Legal Errors in the Panel's Opinion

Appellants also challenge the panel's legal conclusion that "a vessel or facility is a point 'from which oil or a hazardous substance is discharged' if it is a point at which controlled confinement is lost."  *In re Deepwater Horizon*, 753 F.3d at 573 (quoting 33 U.S.C. § 1321(b)(7)(A)).

As an initial matter, BP suggests that the panel "realized" that "only one instrumentality can bear [CWA] liability for a discharge of a given quantum of oil," BP Pet. Reh'g 10, and that the opinion's "logic . . . suggests that Transocean . . . could not be held liable at all," BP Pet. Reh'g 2.  Although Appellants would

perhaps have preferred that the court adopt its "single instrumentality" theory, we did no such thing. *See In re Deepwater Horizon*, 753 F.3d at 573 ("[A] vessel or facility is *a* point 'from which oil or a hazardous substance is discharged' if it is *a* point at which controlled confinement is lost" (emphasis added)). The opinion makes clear that "any culpability on the part of the *Deepwater Horizon*'s operators does not exempt the well owners from the liability at issue here." *Id.* at 575. Because the Transocean entities settled, we did not need to consider whether the oil discharged from the well might also have constituted a "discharge" from the *Deepwater Horizon*. Nor did we need to decide for purposes of other hypothetical scenarios not at issue here precisely under what circumstances civil penalty liability attaches for the owners and operators of vessels or facilities "upstream" and "downstream" from the facility or vessel at which controlled confinement was lost.

Appellants also attempt to distinguish the cases we relied upon in support of our holding. Anadarko points to the fact that there is "no reported decision in which the owner of a facility has been held liable for penalties after a discharge from a vessel connected to the facility." Anadarko Pet. Reh'g 7. BP similarly argues that "the cases on which the panel relied . . . . address the different situation where oil is discharged from a *single* instrumentality into the environment and it simply happens to flow across property owned by third parties (who bear no coequal legal responsibility as rig owners and operators to keep the oil confined) before reaching water." BP Pet. Reh'g 11. These arguments may be true so far as they go,[6] but only because no prior reported

---

[6] Some of the cases cited in the panel opinion may very well have involved instances in which oil discharged from one facility traversed through a second facility, both of which could have been subject to liability under Section 311. For example, in *Pepperell Associates v. EPA*, 246 F.3d 15 (1st Cir. 2001), which involved oil that spilled from a factory, through a sewer, and ultimately into a creek, *id.* at 20, the sewer, in addition to the factory, may have been considered an "onshore facility," *see* 33 U.S.C. § 1321(a)(10) (defining "onshore facility"

cases have presented facts that are directly analogous to those in the present case. Moreover, Appellants' attempt to distinguish these cases is rooted in an assumption that only one instrumentality may be held liable for a given discharge, an issue that we explicitly did not reach. *See* BP Pet. Reh'g 11 ("[T]he cases on which the panel relied . . . do not speak at all to the real problem of assigning [CWA] liability between one of two mutually exclusive instrumentalities.").

As explained in the panel opinion, our holding is consistent both with the caselaw interpreting Section 311 and with its history of enforcement. The panel opinion points to several cases and agency decisions where owners of facilities received fines under Section 311 for oil that was released from their facility, even though that oil subsequently flowed through conduits or over property owned by third parties before entering navigable water. *See Pepperell Assocs. v. EPA*, 246 F.3d 15, 20 (1st Cir. 2001); *Pryor Oil Co., Inc. v. United States*, 299 F. Supp. 2d 804, 806 (E.D. Tenn. 2003); *Union Petroleum Corp. v. United States*, 651 F.2d 734, 56, 61–62 (Ct. Cl. 1981); *In re D & L Energy, Inc.*, V–W–13 C–006 (EPA ALJ Feb. 27, 2013); *In re Phila. Macaroni Co.*, CWA–III– 187 (EPA ALJ May 28, 1998).[7] Anadarko argues that these cases do not involve penalties under Section 311(b). This contention may be technically true, but it is of little consequence. Although *Pepperell* involved an appeal from an administrative determination that an onshore facility failed to prepare a

---

broadly as "any facility (including, but not limited to, motor vehicles and rolling stock) of any kind located in, on, or under, any land within the United States other than submerged land").

[7] Anadarko challenges the panel opinion's citation to the two EPA administrative orders which, according to Anadarko, are "inapposite and [have] no precedential significance." Anadarko Pet. Reh'g 9, 10 n.4. But the panel never contended that these decisions were binding precedent. Rather, they were cited as *relevant* to rebut Appellants' argument that their Section 311 liability was precluded by the fact that the property traversed by the oil was owned by a third party. *See In re Deepwater Horizon*, 753 F.3d at 574. Anadarko cites no authority rendering a statute's administrative enforcement irrelevant in this context.

spill response plan under Section 311(j), the ALJ had also previously determined that the facility violated Section 311(b)(3), the provision at issue in this case. 246 F.3d at 20–22. Similarly, while *Union Petroleum* concerned cleanup costs under Section 311(i), rather than civil penalties under Section 311(b)(3), *see* 651 F.2d at 741, Section 311(i) applies "where an owner or operator of a vessel or an onshore facility or an offshore facility *from which oil or a hazardous substance is discharged in violation of subsection (b)(3)* of this section acts to remove such oil or substance," 33 U.S.C. § 1321(i) (emphasis added).

BP also argues that the court failed to address BP's argument "that the location of the discharge depends on the instrumentality from which oil *escapes confinement*." BP Pet. Reh'g 8. According to BP, "when oil simply moves from one confined instrumentality to another without escaping, no Clean Water Act violation can possibly occur." BP Pet. Reh'g 9. Along those same lines, Anadarko asserts that "[c]ommonsense dictates that the movement of oil from a facility into a vessel does not retroactively become a 'discharge' within the meaning of Section 311(b)(7) because the oil later exits the vessel's confinement into the environment." Anadarko Pet. Reh'g 6; *see also* Anadarko Suppl. Br. in Supp. of Pet Reh'g 5. This argument—which, prior to the petitions for rehearing, was raised in a single sentence in BP's opening brief, *see* BP Blue Br. 61[8]—lacks merit. The opinion nowhere suggests that the mere act of moving oil from a facility into a vessel constitutes a discharge. Such an act does not result in oil entering navigable waters and does not necessarily denote a loss of controlled confinement. But it does not follow from this that when the

---

[8] The sentence reads: "It is undisputed that the only oil ever to escape confinement and reach water escaped from the *Deepwater Horizon* and its appurtenances and that only oil that reaches water is capable of . . . trigger[ing] Section 1321(b)(7) liability." BP Blue Br. 61.

controlled confinement of oil in a facility is lost such that it enters a vessel and then navigable waters, only the vessel is liable. Neither the CWA nor "commonsense" dictate otherwise.

Appellants further argue that it was improper for the Panel to include a "control" element in defining a "discharge" under the CWA. Anadarko asserts that, "[i]n its transitive form, the verb 'discharge' is defined as '[t]o release, as from confinement . . . .' [and i]n its intransitive form, the verb 'discharge' is defined, in part, as '[t]o pour forth, emit, or release contents.'" Anadarko Pet. Reh'g 5 n.1 (quoting The American Heritage Dictionary of the English Language 530 (3d ed. 1992)). But as Anadarko's own definitions suggest, the term "discharge" focuses not only on a loss of confinement but on the act of "releas[ing]." This connotes a loss of control. BP argues that inclusion of a "control" element to the test improperly "smuggles [into the case] negligence concepts" inconsistent with "the statute's strict liability, locational test." BP Suppl. Br. in Supp. of Pet. Reh'g 6–10. However, the inquiry the panel engaged in—determining whether the well was a point at which controlled confinement was lost (without regard to which party, if any, was responsible for the loss of control)—is entirely consistent with such a test. Anadarko contends that including a control element is also problematic because it would mean that "controlled discharges would not be prohibited" by Section 311. Anadarko Pet. Reh'g 5. This argument is unpersuasive. It appears that Anadarko is arguing that the control element would preclude CWA liability in situations when a party *intended* to discharge oil and other hazardous substances. But this confuses the terms "control" and "intent." There is no reason, under our construction of discharge, why a party would not be liable when it intentionally gives up control of oil that had been confined within a facility or vessel that it owned or operated.

10

No. 12-30883

Anadarko also attacks the panel opinion's standard for determining the point from which oil is discharged as "unworkable." Anadarko hypothesizes "a system where 24 separately owned and operated wells connect to a vessel, which connects to a pipeline, which connects to a floating platform, which interconnects with an interstate pipeline, which interconnects with an onshore facility dozens of miles away," and asks: "How could a fact-finder find the precise point where 'controlled confinement is lost' within that system?" Anadarko Pet. Reh'g 8. Anadarko, however, fails to give any reasons explaining why it would be difficult to determine where controlled confinement is lost in an interconnected system. In this case, for instance, it was not difficult to determine that the controlled confinement of oil was lost in the well. Second, Anadarko's hypothetical again assumes that there may only be a single point at which controlled confinement is lost, an issue we did not rule on.

Both BP and Anadarko also contend that the panel should have applied the rule of lenity or the anti-penalty canon to construe Section 311 narrowly so as not to apply to them. However, such presumptions are warranted only "if, after considering text, structure, history, and purpose, there remains a grievous ambiguity or uncertainty in the statute, such that the Court must simply guess as to what Congress intended." *Barber v. Thomas*, 560 U.S. 474, 488 (2010) (internal citation and quotation marks omitted). Here, because the text of Section 311, and the history of its application, clearly demonstrate that a vessel or facility is a point "from which oil or a hazardous substance is discharged," 33 U.S.C. § 1321(b)(7)(A), if it is a point at which controlled confinement is lost, we decline Appellants' appeals to the rule of lenity and the anti-penalty canon.

Finally, BP argues that it is not, "as the panel thought, attempting to introduce concepts of 'third-party fault' into the strict-liability scheme of the

11

[CWA]." BP Pet. Reh'g 14. But this argument is contradicted by Appellants' briefing in this case, both before the panel and before the lower court. At multiple times in the course of this litigation, Appellants have attempted to shift liability to Transocean on the grounds that they were not at fault for the spill, but that Transocean was at fault.

## III.   Conclusion

For the reasons given in the panel opinion, as supplemented hereby, the panel continues to hold that the district court judgment was correct.