# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

—————

No. 13-20243

—————

United States Court of Appeals
Fifth Circuit

**FILED**
September 18, 2014

Lyle W. Cayce
Clerk

UNITED STATES OF AMERICA,

Plaintiff-Appellee

v.

TRANSOCEAN DEEPWATER DRILLING, INCORPORATED,

Defendant-Appellant

—————

Appeal from the United States District Court
for the Southern District of Texas

—————

Before REAVLEY, JONES, and GRAVES, Circuit Judges.

REAVLEY, Circuit Judge:

Transocean Deepwater Drilling, Inc. appeals from the district court's order enforcing administrative subpoenas issued by the Chemical Safety and Hazard Investigation Board in connection with an investigation following the disaster on the *Deepwater Horizon* drilling unit in the Gulf of Mexico. Transocean contends that the subpoenas should have been quashed because the Board lacks authority to investigate the incident. We AFFIRM the district court's judgment.

## I.

On April 20, 2010, a blowout, explosion, and fire occurred during drilling operations at the Macondo lease site in the Gulf of Mexico. The Macondo well was being drilled by the *Deepwater Horizon*, a mobile offshore drilling unit

No. 13-20243

("MODU") tasked to the job by Transocean. As a result of the incident, eleven people were tragically killed, a large volume of flammable gas, oil, and other hazardous substances were released into the water and ambient air, and substantial property damage occurred.

Numerous governmental agencies responded to the disaster, including the Chemical Safety and Hazard Investigation Board ("CSB" or "the Board"). Established by the Clean Air Act Amendments of 1990 and modeled after the National Transportation Safety Board ("NTSB"), the CSB serves a public safety mission by investigating accidental releases of hazardous substances into the ambient air and by reporting to the public its findings and recommendations for preventing and minimizing the risk of industrial chemical accidents.

As part of its investigation into the incident at the Macondo well, the CSB issued five administrative subpoenas to Transocean. The subpoenas sought answers to interrogatories and the production of relevant records, including documents generated by Transocean's own internal investigation. Transocean took the position that the CSB lacked authority to investigate the incident, and it therefore failed to comply fully with the CSB's subpoenas.

The United States filed a petition on behalf of the CSB to enforce the administrative subpoenas, while Transocean moved to quash them and to dismiss the petition. Transocean argued that the CSB was not authorized to conduct an investigation because, *inter alia*, the incident was a marine oil spill over which the CSB lacks jurisdiction, and the incident did not occur on a stationary source.

The district court denied Transocean's motion and ordered enforcement of the subpoenas. The district court held that the CSB was investigating only the release of airborne gases from the blowout and explosion and was not investigating the subsequent oil spill from the well. The court further

2

No. 13-20243

determined that the CSB would lack authority to investigate an incident involving a marine oil spill only if the NTSB was authorized to investigate. The court held that the NTSB was not authorized to investigate this incident, however, because the incident was located fifty miles off the coast of the United States on the Outer Continental Shelf and did not involve a "vessel of the United States," and because the incident was not transportation related. The court also concluded that the *Deepwater Horizon* and its subsea riser comprised a drilling installation that satisfied the statutory requirement of a "stationary source" from which the accidental release of gases the CSB was authorized to investigate. The district court therefore held that the CSB had authority to investigate the incident and to issue the administrative subpoenas. Transocean now appeals.

## II.

Administrative subpoenas issued in aid of an investigation will generally be enforced judicially if "(1) the subpoena is within the statutory authority of the agency; (2) the information sought is reasonably relevant to the inquiry; and (3) the demand is not unreasonably broad or burdensome." *See Burlington N. R. Co. v. Office of Inspector Gen., R.R. Ret. Bd.*, 983 F.2d 631, 638 (5th Cir. 1993); *see also United States v. Powell*, 379 U.S. 48, 57-58, 85 S. Ct. 248, 255 (1964) (holding that enforcement of administrative subpoenas requires a showing "that the investigation will be conducted pursuant to a legitimate purpose, that the inquiry may be relevant to the purpose, that the information sought is not already within the [agency's] possession, and that the administrative steps required by [statute] have been followed"). The Government bears the initial burden to show that these criteria have been met, although the burden to make a prima facie case is "minimal." *United States v. Tex. Heart Inst.*, 755 F.2d 469, 474 (5th Cir. 1985), *overruled on other grounds by United States v. Barrett*, 837 F.2d 1341 (5th Cir. 1988) (en banc). Once the

3

No. 13-20243

Government has made a prima facie case, the burden of going forward shifts to the party opposing the subpoenas. *Id.*

In this case, Transocean focuses its arguments on appeal on the authority of the CSB to issue the subpoenas. We review the district court's factual findings underlying its decision on this issue for clear error and its conclusions of law de novo. *Burlington*, 983 F.2d at 638, 641.

## III.

Transocean contends that the CSB had no authority to issue the administrative subpoenas because the CSB lacked jurisdiction to investigate the incident at the Macondo well. An administrative agency's authority is necessarily derived from the statute it administers and may not be exercised in a manner that is inconsistent with the administrative structure that Congress has enacted. *See FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 125, 120 S. Ct. 1291, 1297 (2000); *see also Texas v. United States*, 497 F.3d 491, 500-01 (5th Cir. 2007). Here, as noted above, the CSB is an independent federal investigative agency established by the Clean Air Act Amendments of 1990. *See* Pub. L. No. 101-549, Title III, sec. 301, 104 Stat. 2399 (Nov. 15, 1990). The Board is authorized to "investigate (or cause to be investigated), determine and report to the public in writing the facts, conditions, and circumstances and the cause or probable cause of any accidental release resulting in a fatality, serious injury or substantial property damages." 42 U.S.C. § 7412(r)(6)(C)(i). An "accidental release" is "an unanticipated emission of a regulated substance or other extremely hazardous substance into the ambient air from a stationary source." § 7412(r)(2)(A). A "stationary source" is defined as "any buildings, structures, equipment, installations or substance emitting stationary activities (i) which belong to the same industrial group, (ii) which are located on one or more contiguous properties, (iii) which are under the control of the same person (or persons

4

No. 13-20243

under common control), and (iv) from which an accidental release may occur."
§ 7412(r)(2)(C).

## A.

Transocean argues first that the CSB lacked jurisdiction to investigate the incident at the Macondo well because the *Deepwater Horizon* is not a "stationary source" as that term is contemplated by the statute. Transocean reasons that because the word "stationary" in the term "stationary source" is not defined, the word must be construed as commonly understood, which Transocean contends means a fixed and unchanging object rather than something that is moveable. Transocean argues that the *Deepwater Horizon* was not only moveable but also was a "vessel in navigation." It reasons, therefore, that the drilling unit could not be a stationary source. We disagree with Transocean's reasoning.

Transocean is correct that similar mobile offshore drilling units and other structures, and even the *Deepwater Horizon* itself, have been held to be vessels under maritime law. *See, e.g.*, *Demette v. Falcon Drilling Co.*, 280 F.3d 492, 498-99 (5th Cir. 2002), *overruled in part on other grounds by Grand Isle Shipyard, Inc. v. Seacor Marine, LLC*, 589 F.3d 778 (5th Cir. 2009) (en banc). For example, in *Demette*, we noted that "special-purpose moveable drilling rigs, including jack-up rigs, are vessels within the meaning of admiralty law." *Demette*, 280 F.3d at 498 n.18. It is also well-established that "special-purpose structures" may remain vessels under the Jones Act while engaged in drilling operations. *See, e.g., Offshore Co. v. Robison*, 266 F.2d 769, 776 (5th Cir. 1959). And under Supreme Court precedent a "watercraft practically capable of maritime transportation" is considered to be a "vessel" under the Longshore and Harbor Workers' Compensation Act regardless of its purpose or state of transit at a particular moment. *Stewart v. Dutra Constr. Co.*, 543 U.S. 481, 497, 125 S. Ct. 1118, 1129 (2005). Indeed, the Supreme Court held that a

watercraft does not "pass in and out of Jones Act coverage depending on whether it was moving at the time of the accident." *Id.* at 495-96, 125 S. Ct. at 1128. Based on the foregoing authority, the district court in the multi-district litigation spawned from the Macondo well incident held that the *Deepwater Horizon* was a vessel under general maritime law. *See In re Oil Spill by the Oil Rig "DEEPWATER HORIZON" in the Gulf of Mexico, on April 20, 2010*, 808 F. Supp. 2d 943, 950 (E.D. La. 2011); *see also In re Deepwater Horizon*, 745 F.3d 157, 164 (5th Cir. 2014) (noting the vessel status of the drilling unit).

Nevertheless, in this case we are not dealing with the application of, or definitions under, the Jones Act and general maritime law. The fact that the *Deepwater Horizon* may be a vessel for purposes of maritime law does not answer the question whether it meets the specific statutory definition of a "stationary source" under the Clean Air Act.

The phrase "stationary source" is expressly defined by the Clean Air Act. When Congress provides a specific definition of a term, we must accept that meaning and limit our analysis to the prescribed definition. *See Stenberg v. Carhart,* 530 U.S. 914, 942, 120 S. Ct. 2597, 2615 (2000) ("When a statute includes an explicit definition, we must follow that definition, even if it varies from that term's ordinary meaning."); *cf. Hamilton v. United Healthcare of La., Inc.,* 310 F.3d 385, 391 (5th Cir. 2002) ("A fundamental canon of statutory construction instructs that *in the absence of a statutory definition*, we give terms their ordinary meaning." (emphasis added)); *see also United States v. Crittenden,* 372 F.3d 706, 711 (5th Cir. 2004) (Dennis, J., concurring in part and dissenting in part) ("[W]hen context dictates that a term has a particular definition, that definition will apply instead of the plain meaning of the term."). We therefore must apply the definition of "stationary source" provided within § 7412(r)(2)(C).

No. 13-20243

We find nothing within the definition of "stationary source" found in § 7412(r)(2)(C) that precludes a vessel from satisfying the statutory requirements for a stationary source.  Indeed, counsel for Transocean conceded during oral argument that a vessel could be stationary, but he argued that the drilling unit here was in constant motion over the well because of the unit's stabilizing thrusters.  The amicus makes the same argument, contending that under Coast Guard regulations the *Deepwater Horizon* was a vessel considered to be underway.

Of course, the whole point of the stabilizing thrusters is to keep the drilling unit largely stationary over the well so that it can perform its drilling operation, a "stationary activity."  *See* § 7412r(2)(c).  Regardless whether the unit is considered to be underway, the *Deepwater Horizon* was "dynamically-positioned" and "employed a satellite global positioning device and complex thruster technology *to stabilize itself*."  *In re Oil Spill by the Oil Rig "DEEPWATER HORIZON" in the Gulf of Mexico, on April 20, 2010*, 808 F. Supp. 2d 943, 950 (E.D. La. 2011) (emphasis added).  Its eight directional thrusters were used to keep the rig in place over the wellhead during drilling.  National Commission on the BP Deepwater Horizon Oil Spill and Offshore Drilling, Macondo: The Gulf Oil Disaster, *Chief Counsel's Report* 29 (2011), available at http://www.eoearth.org/files/164401_164500/164423/full.pdf (hereinafter "Chief Counsel's Report").

It is true that the *Deepwater Horizon* was capable of propulsion. However, this propulsion ability is an advancement in drilling technology that has allowed these units to arrive and remain at different drilling locations, making it easier for the oil and gas industry to drill for oil in deeper water.  *See* Chief Counsel's report at 12.  This is because "[i]n water depths greater than about 1,000 feet, it is increasingly impractical to conduct production operations from structures that are supported by the ocean floor, and floating facilities

No. 13-20243

and subsea production systems dominate." *Id.* at 7. This economic advantage to the oil and gas industry does not mean, however, that the activity of the mobile drilling units cannot come under the CSB's jurisdiction as a stationary source if other statutory conditions are met, even though the drilling unit is also a vessel. "Once moved onto location, a [dynamically positioned] rig holds itself in place above a drilling location using satellite positioning technology and directional thrusters." *Id.* at 12-13; *see also id.* at 26 ("Dynamically positioned MODUs utilize dynamic satellite positioning technology connected to powerful directional thrusters to maintain themselves in place over a subsea wellhead."). In this case, the *Deepwater Horizon* was deployed to the Macondo well site in February 2010 and had remained in place at the site for approximately two months.[1] *See id.*

---

[1] The amicus urges that the *Deepwater Horizon* could not be a stationary source because under Coast Guard regulations it is considered to be a vessel "underway" and not "on location." It posits that if a vessel is not "on location" it cannot also be a "stationary source." In support of this argument the amicus relies on a Coast Guard investigation report of the *Deepwater Horizon* incident that discussed the status of the drilling unit. *See* U.S. Coast Guard, *Report of Investigation into the Circumstances Surrounding the Explosion, Fire, Sinking, and Loss of Eleven Crew Members Aboard the MOBILE OFFSHORE DRILLING UNIT DEEPWATER HORIZON in the Gulf of Mexico April 20–22, 2010*, at I-10, available at https://www.hsdl.org/?view&did=6700 (hereinafter "Coast Guard Report"). The terms "on location" and "underway" have specific statutory definitions, however, that do not affect whether the vessel may be a "stationary source" for purposes of the Clean Air Act. For example, "on location" means merely that the drilling unit is anchored. *See* 46 C.F.R. § 10.107 ("On location means that a mobile offshore drilling unit is bottom bearing or moored with anchors placed in the drilling configuration."). Because the *Deepwater Horizon* was a dynamically positioned, anchor-less MODU, it could not satisfy the regulatory definition of "on location" and was therefore considered to be "underway." *See* Coast Guard Report at I-5. The Coast Guard Report notes that whether a vessel is "on location" or "underway" determines the navigation rules that the vessel must follow, such as for minimum manning and operational requirements. *See id.* at I-5. That status alone does not indicate whether the vessel is a "stationary source" because a vessel may be "underway" but not "making way." *Id.* at I-5-6. The Coast Guard Report specifically recognizes that even though a vessel does not meet the statutory definition for being "on location," it may nevertheless be "essentially maintaining a fixed position" through the use of its dynamic positioning system. *Id.* at I-6. That was the case with the *Deepwater Horizon*.

8

No. 13-20243

The Government urges, and the district court essentially found, that the Macondo drilling installation as a whole was a stationary source. We agree. At the time of the blowout and explosion the drilling operations occurred at a fixed, specific point in the Gulf of Mexico—the Macondo lease site—and the *Deepwater Horizon* was physically connected (though not anchored) at that site and maintained a fixed position. The drilling installation as a whole included the drilling unit, along with its casing, wellhead, riser, and related apparatus. The blowout preventer alone was more than five stories tall and weighed more than 300 tons sitting atop the wellhead on the ocean floor. Chief Counsel's Report at 29-30. The *Deepwater Horizon* was then connected to the wellhead by 5000 feet of drill pipe. *See In re Oil Spill by the Oil Rig "DEEPWATER HORIZON,"* 808 F. Supp. 2d at 950. As noted above, a stationary source includes "*any* buildings, structures, equipment, installations or substance emitting stationary activities." § 7412(r)(2)(C) (emphasis added). The drilling installation here satisfied this definition.[2]

Transocean raises a question in its reply brief about the terms of the stationary source definition, namely that the source "belong to the same industrial group," be "located on one or more contiguous properties," be "under the control of the same person," and be something "from which an accidental release may occur." § 7412(r)(2)(C). Transocean has never, in the district court, or its initial brief, raised this argument. Because we do not consider arguments raised for the first time in a reply brief, we decline to address this issue. *See DePree v. Saunders*, 588 F.3d 282, 290 (5th Cir. 2009).

---

[2] Again, that the drilling unit itself was capable of propulsion and could and did use its thrusters to counter-act wave activity in order to remain in place over the well does not negate the fact that the drilling operation of the *Deepwater Horizon* was, at the very least, a "stationary activity." *See* § 7412(r)(2)(C).

9

No. 13-20243

## B.

Transocean next argues that the CSB lacked jurisdiction to investigate the Macondo well incident because Congress specifically denied the CSB authority over this type of incident.  Its argument is essentially two-fold: first, it contends that the Macondo well incident was a marine oil spill, and the Clean Air Act specifically precludes the CSB from investigating all marine oil spills; second, it contends that even if the statute does not preclude the CSB from investigating all marine oil spills, the CSB could not investigate this incident because the NTSB had jurisdiction to investigate.

Transocean's argument is based on the following provision of the Clean Air Act:

> The Board shall coordinate its activities with investigations and studies conducted by other agencies of the United States having a responsibility to protect public health and safety.  The Board shall enter into a memorandum of understanding with the National Transportation Safety Board to assure coordination of functions and to limit duplication of activities which shall designate the National Transportation Safety Board as the lead agency for the investigation of releases which are transportation related.  *The Board shall not be authorized to investigate marine oil spills, which the National Transportation Safety Board is authorized to investigate.*  The Board shall enter into a memorandum of understanding with the Occupational Safety and Health Administration so as to limit duplication of activities.  In no event shall the Board forego an investigation where an accidental release causes a fatality or serious injury among the general public, or had the potential to cause substantial property damage or a number of deaths or injuries among the general public.

§ 7412(r)(6)(E) (emphasis added).

10

No. 13-20243

Transocean argues that the above italicized language shows that the CSB is not authorized to investigate marine oil spills and that, instead, the NTSB is authorized to investigate all of those incidents.[3]

The district court held that the marine oil spill exclusion did not apply to the CSB's investigation of the Macondo well incident because the CSB was not investigating the marine oil spill associated with the disaster but rather was investigating the release of gases and the explosion that preceded the release of oil. We agree with the district court's conclusion. [4]

Although Transocean argues that the primary environmental disaster resulting from the Macondo well incident was the massive oil spill, it also concedes in its brief that the blowout, explosion, and fire, followed by the collapse of the *Deepwater Horizon*, involved the release of airborne gases. That release was the triggering of the CSB's authority to investigate. *See* § 7412(r)(2)(A) (authorizing CSB investigations of accidental releases, which are defined as "unanticipated emissions[s] . . . into the ambient air"). Transocean argues, however, that because the CSB's jurisdiction always depends on a release of gases, the marine oil spill exclusion (1) necessarily

---

[3] Transocean refers to the emphasized language as the "marine oil spill exclusion." For ease of reference we use the same terminology. We also refer to the clause beginning with the word "which" as the "comma-*which*" clause.

[4] The Coast Guard Report found as follows:

As the well control incident unfolded, an uncontrolled volume of gas flowed up from the wellhead to the MODU and onto the Drill Floor and Main Deck. Gas samples collected by Woods Hole Oceanographic Institute on July 27, 2010 show that the composition of the uncontrolled gas discharged from the well was primarily methane (69.9%), with lesser amounts of ethane (6.9%) and propane (4.5%). The remainder of the gas consisted of a mixture of various weight hydrocarbons. Several minutes after the start of the release of gas from the wellhead, a gas cloud within the flammable range formed over large areas on several decks. The explosions likely occurred when gas from this cloud encountered one or more ignition sources on the Drill Floor or elsewhere on the MODU.

Coast Guard Report, 5-6.

contemplates an accidental release that would otherwise be within the CSB's jurisdiction but is merely incidental to a marine event, and (2) expressly excludes that event from CSB's investigatory authority. A contrary conclusion, Transocean argues, would render the marine oil spill exclusion surplusage. Transocean's argument assumes, however, that the CSB may not investigate *any* release of gases associated with a marine oil spill. As we explain, we disagree.

Transocean's argument is textual, and it is primarily based on the statutory provision noted above that the CSB "shall not be authorized to investigate marine oil spills, which the National Transportation Safety Board is authorized to investigate." *See* § 7412(r)(6)(E). According to Transocean's reading of that sentence, the statute precludes the CSB from investigating *all* marine oil spills insofar as the NTSB has jurisdiction over those occurrences.

We agree with the district court, however, that the CSB is not precluded from investigating all marine oil spills, but rather only those "spills, which" the NTSB may investigate. In other words, the CSB may be precluded from investigating those marine-related incidents that the NTSB is authorized to investigate. This interpretation of the statute reads "which" to mean "that," and it comports with the statutory scheme as a whole.

Transocean contends, however, that based on the rules of grammar and punctuation the word "which" preceded by a comma creates a nonrestrictive, descriptive clause so that the declarative portion of the sentence in § 7412(r)(6)(E)—precluding investigation of marine oil spills—is controlling. *See, e.g.*, William Strunk, Jr. & E.B. White, *The Elements of Style* 3-4 (3d ed. 1979) (hereinafter "Strunk & White") (explaining that nonrestrictive clauses introduced by "which" add nonessential parenthetic information and are set off by commas). If we were reading the sentence in isolation we might agree. But while the rules of grammar are not irrelevant, we should not "be guided by a

No. 13-20243

single sentence or member of a sentence;" rather, we must "look to the provisions of the whole law, and to its object and policy." *U.S. Nat'l Bank of Oregon v. Indep. Ins. Agents of Am., Inc.*, 508 U.S. 439, 455, 113 S. Ct. 2173, 2182 (1993) (internal quotation marks and citation omitted); *cf. United States v. Flora*, 362 U.S. 145, 149, 80 S. Ct. 630, 633 (1960) (noting that a court "does not review congressional enactments as a panel of grammarians").

We note first that reading the comma-*which* clause to mean "that" is consistent with subsection (E) as a whole and the subsection's other uses of the word "which." In addition to the comma-*which*, the statute twice uses the word "which" in the previous sentence, reading thusly: "The Board shall enter into a memorandum of understanding with the National Transportation Safety Board to assure coordination of functions and to limit duplication of activities *which* shall designate the National Transportation Safety Board as the lead agency for the investigation of releases *which* are transportation related." § 7412(r)(6)(E) (emphasis added). The first "which" in this sentence refers to the "memorandum of understanding" while the second "which" refers to "releases." It is clear that each "which" in this sentence should be read as "that" because the clauses are restrictive, i.e. they give essential meaning about the preceding nouns (the "memorandum of understanding" and the "releases"). Although Congress is presumed to know the rules of grammar, *see United States v. Goldenberg*, 168 U.S. 102-03, 18 S. Ct. 3, 4 (1897), this grammatical oversight is understandable, as "[u]sing *which* for *that* is perhaps the most common blunder with these words." Bryan A. Garner, *Garner's Dictionary of Legal Usage* 889 (3d ed. 2011); *see also* Strunk & White at 59 ("The use of *which* for *that* is common in written and spoken language.").

If we read the first two uses of "which" in subsection (E) to mean "that," it would be natural to construe the comma-*which* to also mean "that." *See Powerex Corp. v. Reliant Energy Servs., Inc.*, 551 U.S. 224, 232, 127 S. Ct. 2411,

13

2417 (2007) ("[I]dentical words and phrases within the same statute should normally be given the same meaning."); *see also U.S. Nat'l Bank of Oregon*, 508 U.S. at 460, 113 S. Ct. at 2185. Of course, the difference between the first two uses of the word "which" in subsection (E) and the comma-*which* clause is the presence of the comma, and in isolation the comma could be significant. But "a purported plain-meaning analysis based only on punctuation is necessarily incomplete and runs the risk of distorting a statute's true meaning." *Id.* at 454, 113 S. Ct. at 2182; *see Costanzo v. Tillinghast*, 287 U.S. 341, 344, 53 S. Ct. 152, 153 (1932) ("It has often been said that punctuation is not decisive of the construction of a statute."). Construing the words in context, as we must, we strive to "interpret the statute 'as a symmetrical and coherent regulatory scheme.'" *Brown & Williamson Tobacco Corp.*, 529 U.S. at 133, 120 S. Ct. at 1301 (citation omitted). Here, we must consider the "comma-*which*" clause along with the entire provision as part of "'a holistic endeavor.'" *U.S. Nat'l Bank of Oregon*, 508 U.S. at 455, 113 S. Ct. at 2182 (citation omitted). We will "'disregard the punctuation, or repunctuate, if need be, to render the true meaning of the statute.'" *Id.* at 462, 113 S. Ct. at 2186 (citation omitted).

Subsection (E) contemplates that the CSB is not the only government agency charged with a public safety mission and may not be the only investigating agency; indeed, it expressly directs the CSB to "coordinate its activities with investigations and studies by other agencies" with responsibility to protect public health and safety. § 7412(r)(6)(E). Even more specifically, the statute directs the CSB to "enter into a memorandum of understanding" with the NTSB in order to coordinate activities, limit duplication of efforts, and designate the NTSB as the lead agency if an accidental release is transportation related. *Id.* We agree with the district court that this provision must mean there is a category of marine oil spills that are non-transportation related and over which the NTSB lacks exclusive authority. If the comma-

*which* clause of the marine oil spill exclusion simply precluded the CSB from investigating all marine oil spill incidents there would be no need for the requirement that CSB coordinate with the NTSB or other government agencies to avoid duplication of efforts. In context, the structure of the statute, including the prior uses of the word "which," indicates an intent that the comma-*which* clause was not meant to be non-restrictive.

Moreover, the statute expressly directs the CSB to investigate any time an accidental release causes a fatality or serious injury to the general public. *See id.* ("*In no event shall the Board forego an investigation* where an accidental release causes a fatality or serious injury among the general public, or had the potential to cause substantial property damage or a number of deaths or injuries among the general public." (emphasis added)). This must mean that for especially serious incidents involving either grave injury or the risk of injury, including marine oil spills, the CSB could have concurrent investigative authority with other agencies.[5] And again, the CSB would be required to coordinate its efforts with any other agencies. This provision adds further support to the conclusion that the marine oil spill exclusion is not the all-encompassing prohibition that Transocean urges.

We believe that looking at the full text of the statute, rather than one isolated clause, along with the statute's structure and its public safety purpose shows that the comma-*which* clause was not intended to preclude the CSB from investigating all incidents involving marine oil spills. *See U.S. Nat'l Bank of*

---

[5] Transocean argues that this provision of subsection (E) is inapplicable here because the Macondo well incident was incapable of causing death or injury to members of the general public insofar as the disaster occurred fifty miles off the coast of the United States. First, this argument is inapposite to whether the CSB is precluded from investigating all marine oil spills in the first place. Second, the offshore location of the disaster does not preclude the *potential* for injury to persons on shore since it cannot be denied that airborne hazardous substances could migrate and cause injury on land.

*Oregon*, 508 U.S. at 455, 113 S. Ct. at 2182 (eschewing isolated words or sentences in favor of "a statute's full text, language as well as punctuation, structure, and subject matter"). This reading of the statute best comports with the overall regulatory scheme. *See Brown & Williamson Tobacco Corp.*, 529 U.S. at 133, 120 S. Ct. at 1301; *see also U.S. Nat'l Bank of Oregon*, 508 U.S. at 461 n.10, 113 S. Ct. at 2186 n.10 (searching for "the best reading of the Act, despite the punctuation marks"). We conclude, therefore, that the statute did not categorically preclude the CSB from investigating all incidents that happen to include a marine oil spill.

Transocean contends that even if the CSB could otherwise investigate the incident at the Macondo well, it was precluded from doing so in this case because the NTSB was authorized to investigate. Transocean relies solely on 49 U.S.C. § 1131(a)(1)(F), which grants the NTSB authority to investigate, *inter alia*, "catastrophic" accidents that are "related to the transportation of individuals or property." It asserts that the Macondo well incident was catastrophic and that the disaster was related to transportation because the *Deepwater Horizon* was a vessel in navigation.

However, when the blowout occurred on April 20, 2010, the *Deepwater Horizon* was dynamically positioned and physically attached to the seabed, having been on site and engaged in drilling operations for a number of months. The district court held that this fact was crucial to the determination that the incident was not transportation related. Transocean cites no contrary authority. Merely because a disaster involves a vessel does not mean that the disaster was necessarily related to transportation. Although the drilling unit may have been capable of transportation, it was not involved in transporting either individuals or property at the time of the blowout, explosion, and fire. *See* § 1131(a)(1)(F). In other words, although the *Deepwater Horizon* possessed characteristics associated with transportation, those characteristics played no

role in the disaster, and the accident was not related to transportation.  We agree with the district court that § 1131(a)(1)(F) is inapplicable and that the NTSB lacked jurisdiction to investigate the incident under that provision, meaning that the CSB was authorized to act.

## IV.

For the reasons stated above, we conclude that the CSB had jurisdiction to investigate the incident at the Macondo well and to issue the administrative subpoenas.    The district court's judgment ordering enforcement of the subpoenas is therefore AFFIRMED.

No. 13-20243

JONES, Circuit Judge, dissenting.

I respectfully disagree with the majority opinion, which assists the United States Chemical Safety Board ("CSB") in expanding its jurisdiction into novel territory disallowed by Congress. This is the first time, in twenty years after CSB was ordained, that the agency has sought to investigate in connection with an offshore oil spill.[1]  The majority's interpretation of the Clean Air Act disregards the plain meaning of words and grammar and the most fundamental maritime concept, which is the definition of a vessel. To summarize my view:  the Mobile Offshore Drilling Unit Deepwater Horizon was a vessel, not a "stationary source" pursuant to 42 U.S.C. § 7412(r)(2)(C), and the Macondo Well blowout caused a "marine oil spill," 42 U.S.C. § 7412(r)(6)(E), which excluded the blowout from CSB jurisdiction either *in toto* or because the NTSB was empowered to investigate.

Because the majority opinion aptly describes the background of this controversy, only a bit need be repeated here.  Transocean objects to administrative subpoenas served by CSB when the agency instituted an investigation following the Deepwater Horizon oil spill disaster. The standard for challenging an administrative subpoena is strict:  courts may only interfere with the process in a limited number of circumstances, one of which arises when the agency plainly lacks jurisdiction. *See Burlington N. R. Co. v. Office of Inspector Gen., R.R. Ret. Bd.*, 983 F.2d 631, 638 (5th Cir. 1993); *see also United States v. Powell*, 379 U.S. 48, 57–58, 85 S. Ct. 248, 255 (1964).  CSB was created as a Clean Air Act counterpart to the National Traffic Safety Board ("NTSB") and charged with investigating unanticipated releases of hazardous substances into the ambient air from "stationary sources."   42 U.S.C. § 7412(r)(2)(C) (defining the term "accidental release" found in 42 U.S.C.

---

[1] *Inside OSHA*, Vol. 17, No. 13, at 6 (June 29, 2010).

§ 7412(r)(6)(C)(i)). The term "stationary sources," includes "any buildings, structures, equipment, installations or substance emitting stationary activities. . . ." 42 U.S.C. § 7412(r)(2)(C). The Board may follow up an investigation by recommending regulatory measures to avert future releases into the air. NTSB, in contrast, investigates "transportation-related" aviation, highway, rail, marine or pipeline accidents and also makes regulatory recommendations to improve safety. 49 U.S.C. § 1131(a)(1)(F). Not only CSB and NTSB, but numerous other agencies either routinely or at special request investigate accidents with significant public impact. As a result, the statute that created CSB requires this agency to cooperate with or take a second seat to such agencies:

> The Board shall coordinate its activities with investigations and studies conducted by other agencies of the United States having a responsibility to protect public health and safety. The Board shall enter into a memorandum of understanding with the National Transportation Safety Board to assure coordination of functions and to limit duplication of activities which shall designate the National Transportation Safety Board as the lead agency for the investigation of releases which are transportation related. The Board shall not be authorized to investigate marine oil spills, which the National Transportation Safety Board is authorized to investigate. The Board shall enter into a memorandum of understanding with the Occupational Safety and Health Administration so as to limit duplication of activities. In no event shall the Board forego an investigation where an accidental release causes a fatality or serious injury among the general public, or had the potential to cause substantial property damage or a number of deaths or injuries among the general public.

42 U.S.C. § 7412(r)(6)(E).

Under this provision, if the Deepwater Horizon was not a stationary source, CSB lacked the authority to investigate. Likewise, if the disaster was a marine oil spill, or by even the majority's construction a marine oil spill that

NTSB was authorized to investigate, CSB lacks authority. I will discuss each of these limits on CSB's authority in turn.

### 1. Can a vessel be a "stationary source"?

This question seems to answer itself. A "vessel," as defined in federal law, is a device capable of providing transportation on water. 1 U.S.C. § 3; *Stewart v. Dutra Construction Co.*, 543 U.S. 481, 495, 125 S. Ct. 1118, 1128 (2005). "Stationary" means "fixed in a station, course or mode; unchanging, stable, static." Webster's Third New International Dictionary 2229 (1986). Not only does "stationary" modify all of the following terms, but the following illustrations of "stationary sources" are inherently fixed and immobile ("buildings, structures, equipment, installations . . ."). A vessel capable of transportation is not comparable to these illustrated sources and cannot be a stationary source of emissions. To so conclude erases the line between stationary and mobile sources.

But the majority determines otherwise. First, the majority opinion acknowledges that the Deepwater Horizon is a vessel according to Coast Guard regulations, Supreme Court authority, longstanding case law in this circuit, and multiple decisions relating to this oil spill disaster. However, the majority contends, what is good law for maritime purposes does not govern the Clean Air Act's statutory definition. Alternatively, the majority holds, the Deepwater Horizon was in fact "stationary" when the blowout and oil spill occurred, because its dynamic positioning devices kept the unit essentially in place without anchors securing it to the ocean floor while it engaged in drilling operations. Finally, the majority posits that the "Macondo drilling installation as a whole," allegedly encompassing the drill string, riser, blowout preventer, wellhead and casing, all of which stretch over a mile down and into the Outer Continental Shelf seabed, maintained a stationary position.

No. 13-20243

The majority's fundamental error lies in distorting "stationary" from its ordinary meaning, as required by the tools of statutory interpretation, *Castro v. Collecto, Inc.*, 634 F.3d 779, 786 (5th Cir. 2011). The Deepwater Horizon was a "vessel" from a common sense standpoint. Technically, it was a "dynamically-positioned semi-submersible drilling vessel" that was afloat and under movement at the time of the blowout. *See In re Oil Spill by the Oil Rig Deepwater Horizon in the Gulf of Mexico, on April 20, 2010*, 808 F. Supp. 2d 943, 950 (E.D. La. 2011), *aff'd sub nom. In re Deepwater Horizon*, 745 F.3d 157 (5th Cir. 2014). It navigated, transported personnel and equipment, and continued navigating in order to hold its position in the sea against currents and waves. That it was able to employ advanced technology to accomplish its purpose, rather than sails or rudders, does not detract from its status as a vessel; hence, its status as a "mobile" offshore drilling unit. At all times, it had a navigational crew in addition to a drilling crew. The issue here is not so much whether the Clean Air Act definition must slavishly follow the course of maritime law, but also whether calling this "mobile" offshore drilling a "vessel" conflicts with the ordinary meaning of a "stationary source."

Virtually every opinion of this court relating to the Deepwater Horizon oil spill disaster has referred to the MODU as a "vessel,"[2] and in so doing we have followed a path charted in this court for decades. *See, e.g.*, *Trico Marine Operators, Inc. v. Falcon Drilling Co.*, 116 F.3d 159, 161 (5th Cir. 1997); *Dougherty v. Santa Fe Marine, Inc.*, 698 F.2d 232, 234 (5th Cir. 1983); *Offshore Co. v. Robison*, 266 F.2d 769, 779 (5th Cir. 1959). Our decisions reflect how

---

[2] *See, e.g.*, *In re Deepwater Horizon*, 753 F.3d 570, 571 (5th Cir. 2014); *In re Deepwater Horizon*, 745 F.3d 157, 164 (5th Cir. 2014); *In re Deepwater Horizon*, 739 F.3d 790, 796 (5th Cir. 2014) (labeling the MODU as a vessel).

21

maritime activities have evolved in the last fifty years to include new and ever-more-sophisticated watercraft.  The Supreme Court has also defined "vessels" expansively as "any watercraft practically capable of maritime transportation." *Stewart v. Dutra Constr. Co.*, 543 U.S. 481, 497, 125 S. Ct. 1118, 1128 (2005). Also compelling is the Coast Guard's responsibility for regulating mobile offshore drilling units, which recently led it to conclude that if anything, their status as vessels should be fortified.  Memorandum from S.D. Poulin, U.S. Coast Guard, to CG-5, Potential Legal Issues Associated With Vessels Employing Dynamic Positioning Systems 10 (Feb. 11, 2011).  Why, in the face of ordinary meaning and this body of consistent authority, should a court be able to hold that the Deepwater Horizon, although a "vessel," was a "stationary source"?  This is like holding a pig is a pony.  The language of the statute is broad but it isn't limitless.  Either "stationary" means something related to immobility, or judges are making up a new meaning.

The majority's other reasons for holding that the Deepwater Horizon was a "stationary source" also defy common sense.  The majority's description of the sophisticated dynamic positioning system used by Mobile Offshore Drilling Units like the Deepwater Horizon is flawed and, worse, leads to the possibility that CSB jurisdiction will turn on fact-specific determinations of "stationary" versus "mobile" sources.    Factually, it is true that the thrusters operated by the MODU's navigational crew kept the unit positioned substantially over the wellhead, but the unit continues at all times to move with the wave motions. Essentially, the thrusters permit the unit to tread water.  Anyone treading water, however, is constantly in motion, and so was the Deepwater Horizon. Likewise, a helicopter may hover in place over the ground, but it is always in motion, and I suppose even CSB would not contend it is a "stationary source."

Even more unfortunate is the resort to fact-specific reasoning to determine that this vessel is a "stationary source."   Since the statute draws a

dichotomy between the CSB's responsibility for "stationary source" accidental air releases and NTSB's jurisdiction over "transportation-related" disasters, the CSB's aggressive attempt to blur the dichotomy is at odds with the statute itself. (As will be seen, CSB is horning into the primary jurisdiction of NTSB by urging this court to narrow NTSB's scope as well.) Of course, the statute contemplates splitting duties between NTSB and CSB in appropriate cases, and in such cases requiring CSB to yield to NTSB, but one can easily envision overlaps without CSB's having to mutilate the definition of "stationary." For instance, if a chemical tank exploded at a rail yard and emitted hazardous fumes, there could be a question whether the cause was transportation-related or due to a stationary source nearby. Similarly, toxic substances or fuel used in connection with aircraft and aircraft maintenance might ignite at an aviation center, emitting hazardous air pollutants. The cause of either accident could be "stationary" or "transportation-related." In the Deepwater Horizon disaster, however, CSB contends that the vessel itself was the "stationary source" because it was dynamically positioned. Henceforth, the same argument could result in fully overlapping CSB/NTSB authority whenever a vehicle, aircraft, or vessel happens to be temporarily moored at the time of an unanticipated toxic air emission.

The majority's final rationale for calling this mobile offshore drilling unit a "stationary source" is to embed it in an "installation as a whole" encompassing the Macondo well and the well's casing[3] and wellhead,[4] which

---

[3] *Casing*, SCHLUMBERGER OILFIELD GLOSSARY, (last visited Sept. 16, 2014), http://www.glossary.oilfield.slb.com/en/Terms/c/casing.aspx ("Large-diameter pipe lowered into an openhole and cemented in place.").

[4] *Wellhead*, SCHLUMBERGER OILFIELD GLOSSARY, (last visited Sept. 16, 2014), http://www.glossary.oilfield.slb.com/en/Terms/w/wellhead.aspx ("The system of spools, valves and assorted adapters that provide pressure control of a production well.").

are located underneath or at the level of the seabed. This bottom-up logic is erroneous for two reasons.

First, common sense tells us that the five thousand feet of drill string, plus riser and blowout preventer leading from the MODU to the well hardly created a stationary island 50 miles off the United States coast in the Gulf of Mexico. The MODU Deepwater Horizon and its appurtenances are connected to the seabed.[5] But it is quite inconsistent to say that the "installation" is stationary when the only reason for its being stationary is that the vessel uses dynamic positioning thrusters and is constantly in motion to maintain stability over the wellhead. Broadening the term "installation" to denominate the Macondo well and the Deepwater Horizon a "stationary source" is nothing more than rhetorical legerdemain designed to obfuscate the limits on CSB's jurisdiction.

Second, both statutory law and well settled case law have distinguished between fixed and mobile drilling platforms and offshore devices for decades. The Outer Continental Shelf Lands Act distinguishes between "artificial islands" and vessels in order to demarcate between the application of federal or state law and admiralty law. *See* 43 U.S.C. § 1333(1) (distinguishing between artificial islands subject to the choice of law provisions of 43 § 1333(2)(A) and vessels not subject to such provisions); *see also Herb's Welding, Inc. v. Gray*, 470 U.S. 414, 421–23, 105 S. Ct. 1421, 1426–27 (1985) (outlining the division between artificial islands subject to "borrowed state

---

[5] The majority's bottom-up logic is hard to square with a recent opinion of this Court that referred to the blowout preventer and riser as "appurtenances" of the vessel Deepwater Horizon, and the vessel and its appurtenances as separate from the well. *In re Deepwater Horizon*, 753 F.3d 570, 571 (5th Cir. 2014); *Jerome B. Grubart, Inc. v. Great Lakes Dredge & Dock Co.*, 513 U.S. 527, 535, 115 S. Ct. 1043, 1049 (1995) ([M]aritime law … ordinarily treats an "appurtenance" attached to a vessel in navigable waters as part of the vessel itself.").

law" and other areas subject to maritime law). Artificial islands are drilling or production platforms attached to the seabed in some way and thus fully immobile, while other special purpose structures "such as jack-up rigs, submersible drilling barges, derrick barges, spud barges, and others are vessels as a matter of law." *Manuel v. P.A.W. Drilling & Well Service, Inc.*, 135 F.3d 344, 347 (5th Cir. 1998). It is bedrock that "[w]e assume that Congress is aware of existing law when it passes legislation." *Miles v. Apex Marine Corp.*, 498 U.S. 19, 32 (1990); *see also Goodyear Atomic Corp. v. Miller*, 486 U.S. 174, 184–85, 108 S. Ct. 1704, 1712 (1988) ("We generally presume that Congress is knowledgeable about existing law pertinent to the legislation it enacts."). Setting aside the "marine oil spill exclusion" discussed next, the CSB's jurisdiction over artificial islands as "stationary" sources fits comfortably within the OCSLA dichotomy and background law. Just as clearly, characterizing the MODU Deepwater Horizon with or without the Macondo well as "stationary" does not. The majority's deviation from background law violates the ordinary interpretive presumption as well as the facts.

## 2.  Can the "marine oil spill exclusion" be excluded?

It is unnecessary to wade into the parties' "comma, which" dispute to reach a sensible interpretation of 42 U.S.C. § 7412(r)(6)(C)(i), which excludes marine oil spills from CSB's investigative authority. This provision as a whole expresses Congress's recognition that other agencies have regulatory jurisdiction over hazardous releases into the ambient air. Consequently, CSB has to cooperate and coordinate with such agencies in furtherance of public health and safety. Foreseeing significant potential overlaps, Congress paid particular attention to the interrelation of CSB with two agencies: the OSHA and NTSB. NTSB, relevant here, is deemed the lead agency for releases "which" are "transportation related." We know from the Supreme Court that

"related-to" language is enabling in the broadest sense. *Ingersoll-Rand Co. v. McClendon*, 498 U.S. 133, 138–39, 111 S. Ct. 478, 482–83 (1990) (discussing the breadth of the "related-to" pre-emption language in § 514(a) of ERISA). The CSB, moreover, "shall not be authorized to investigate marine oil spills, which the National Transportation Safety Board is authorized to investigate." Nevertheless, "[i]n no event shall the [CSB] forego an investigation where an accidental release causes a fatality or serious injury among the general public or had the potential to cause substantial property damage or a number of deaths or injuries among the general public." I part company with the majority on the applicability of the "marine oil spill exclusion" and their interpretation of the "danger to the public" catchall language.

Taking the "marine oil spill exclusion" first, even if this language is read holistically and narrowly to exclude CSB from only those marine oil spills "that" the NTSB may investigate, *this* marine oil spill was "related to" transportation through the movement of hydrocarbons from the well through the drill string to the Deepwater Horizon[6] and by virtue of the vessel's constant movement. On the face of the provision, where NTSB was authorized to investigate, CSB must recede. Curiously, however, to expand CSB jurisdiction, at the expense of the NTSB, the majority accepted two of CSB's propositions: this oil spill disaster, the largest in American history, was not within the "marine oil spill exclusion," and even if it was, NTSB lacked jurisdiction. These arguments are wrong. The first one would eviscerate the "marine oil spill exclusion" completely. The second erroneously limits NTSB's authority.

Holding that the "marine oil spill exclusion" does not apply if hazardous substances were incidentally released into the air during a "marine oil spill"

---

[6] Recall that NTSB is also charged to investigate pipeline disasters.

turns the exclusion on its head and renders it a nullity.[7] Virtually any offshore crude oil spill involves the emission of fumes, because petroleum produced from wells is "oil," more technically, "[a] complex mixture of naturally hydrocarbon compounds found in rock. . . . [T]he term is generally used to refer to liquid crude oil. Impurities, such as sulfur, oxygen and nitrogen are common in petroleum." *Petroleum*, SCHLUMBERGER OILFIELD GLOSSARY, (last visited Sept. 16, 2014), www.glossary.oilfield.slb.com/en/Terms/p/petroleum.aspx. The lighter hydrocarbons and impurities in crude oil readily evaporate into the air; as we all know, there is no smoking at gas pumps because of the volatility of hydrocarbons in "oil." CSB's attempt to separate these mixed hydrocarbons temporally from the oil spill disaster, by purporting to focus its investigation on the emission of fumes that ignited and exploded at the platform, is unrealistic. How unrealistic is confirmed by the scope of the agency's subpoena at issue here: CSB called for all of the documents that Transocean turned over to all of the other investigating agencies concerning the blowout, explosion and oil spill. Why? Because the liquid and gaseous hydrocarbons all spewed from the well due to the same errors during the drilling process. The investigation cannot be limited to ambient air releases apart from the events that triggered the marine oil spill. This position is factually unsupportable.

Equally untenable is the holding that NTSB lacked authority to investigate this disaster. NTSB has jurisdiction over "any other accident related to the transportation of individuals or property when the [NTSB] decides--

> (i) the accident is catastrophic;
> (ii) the accident involves problems of a recurring

---

[7] It is an established principle of statutory interpretation that "[w]here possible, every word in a statute should be given meaning." *G.M. Trading Corp. v. C.I.R.*, 121 F.3d 977, 981 (5th Cir. 1997).

character; or
    (iii) the investigation of the accident would carry
      out this chapter.

49 U.S.C. § 1131(a)(1)(F).  The majority fall back on their faulty conclusion that the oil spill disaster was not "transportation related."[8]  Remarkably, the majority must conclude that "[m]erely because a disaster involves a vessel does not mean that the disaster was necessarily related to transportation."  I have already explained why the MODU's status as a vessel is dispositive of the "stationary source" argument; the factual and legal points made there apply even more clearly to this argument.  The logical implication of the majority's interpretation forbids NTSB to operate in its area of expertise when certain catastrophic disasters involve a temporarily immobile vehicle, airplane, train, vessel or pipeline activity.  The settled legal interpretation of "related" forbids this artificial constraint.

Finally, the majority erroneously relies on CSB's catchall investigative power over fatalities, serious injuries or property damages to "the general public."  42 U.S.C. § 7412(r)(6)(E).  The Deepwater Horizon's crew were specialized oilfield or marine employees covered by OSHA, not "the general public."  To be sure, this catchall is an empowering provision, just as Section 1131(a)(1)(F) is empowering to the NTSB.  Unlike the NTSB provision, which empowers transportation "related" investigations, CSB's provision covers actual or potential injuries, fatalities or property damage to "the general public."  On the facts of this case, the provision is clearly inapplicable.  CSB posits its jurisdiction only over the explosion on the MODU Deepwater Horizon

---

[8] The present case involves an accident on the Outer Continental Shelf and is therefore unlike *NTSB v. Carnival Cruise Lines, Inc.,* 723 F. Supp. 1488, 1493 (S.D. Fla. 1989), which dealt with an "extraterritorial investigation" outside of U.S. territory.  Since 43 U.S.C. § 1331(a) makes clear that the Outer Continental Shelf is under U.S. law, any investigation would not be extraterritorial.

that was occasioned by the release of volatile hydrocarbons from the well. The Macondo well was located 50 miles offshore of Louisiana. No one has ever claimed that injury occurred to "the general public" onshore from releases into the ambient air. The term "public" is defined to mean "of, relating to, or affecting the people as an organized community." Webster's Third New International Dictionary 1836 (1986); *see also Black's Law Dictionary* 1264 (8th ed. 1999) (defining public as "[r]elating or belonging to an entire community"). The workers who tragically lost their lives in the vessel's explosion are not, under this definition, "the general public." Congress could have easily described CSB's catchall jurisdiction by referring to "individuals" or "any person," but it chose a different term.

**Conclusion**

This case strictly and properly concerns an agency's statutory authority to issue subpoenas and conduct an investigation. The much broader ramifications of the decision should not, however, be overlooked. First, when Congress has delineated agency authority against clear background principles and with easily defined terms, the agency itself should not play havoc with the statute to expand its authority; an agency has a duty to follow its mandate but go no further. For the sake of maintaining limited government under the rule of law, courts must be vigilant to sanction improper administrative overreach. *See, e.g.*, *Util. Air Regulatory Grp. v. E.P.A.*, 134 S. Ct. 2427, 2449 (2014) (holding that the EPA exceeded its statutory authority). Second, contrary to some fears expressed about the consequences of holding CSB unable to investigate the Deepwater Horizon disaster, there were at least seventeen investigations, including major reports by a Presidential Commission and the Coast Guard. *See* Exec. Order No. 13,543, 75 Fed. Reg. 29,397 (May 21, 2010) (establishing the National Commission on the BP Deepwater Horizon Oil Spill and Offshore Drilling). The Coast Guard, in fact, was required to "make an

investigation and public report on each major fire and each major oil spillage occurring as a result of" exploration, development and production of minerals from the OCS. 43 U.S.C. § 1348(d)(1). There is no dearth of proper investigation to protect public safety. Third, as a result of being deemed by this opinion "stationary sources," nearly all non-standard offshore vessels involved in oil and gas production on the OCS will become subject to Clean Air Act regulation and reports in addition to "all of the regulatory requirements of 'traditional' vessels" imposed by the Coast Guard. *See* 42 U.S.C. § 7412(r)(7)(B)(iii); Memorandum from S.D. Poulin, U.S. Coast Guard, to CG-5, Potential Legal Issues Associated With Vessels Employing Dynamic Positioning Systems 10 (Feb. 11, 2011).

For all these reasons, I respectfully dissent.